THE OCEANIC FOUNDATION, A Hawaii Eleemosynary
Corporation, Plaintiff-Appellee, Cross-Appellant  *v.*
RALPH W. KONDO, Director of Taxation of the State
of Hawaii, Defendant-Appellant, Cross-Appellee

No. 4969

June 16, 1971

RICHARDSON C.J., MARUMOTO, ABE, LEVINSON,
JJ., AND CIRCUIT JUDGE VITOUSEK IN PLACE
OF KOBAYASHI, J., DISQUALIFIED

OPINION OF THE COURT BY MARUMOTO, J.

On January 12, 1967, The Oceanic Foundation brought an action in the circuit court of the first circuit against the State director of taxation for refund of general excise taxes paid under protest to December 31, 1966, in the aggregate sum of $5,231.25. By amendment to complaint made at the conclusion of trial on November 13, 1969, it also sought a refund of all general excise taxes paid subsequent to December 31, 1966.

The circuit court entered its judgment on December 23, 1969. With respect to payments made to December 31, 1966, it adjudged that Oceanic was entitled to a refund of $200 paid after December 13, 1966, but that $5,031.25 paid before that date was government realization. With respect to payments made after December 31, 1966, it adjudged a refund of all payments made to August 1969, in the aggregate sum of $12,576.22.

The director appealed to this court from the entire judgment. Oceanic cross-appealed from a portion thereof which denied recovery of $5,031.25.

We will first give a brief consideration to the cross-appeal, just enough to show that it is without merit. Recovery of $5,031.25 was denied because the payments which made up that sum were made more than 30 days before the action was brought. The claim for refund here is governed by HRS § 40-35, which provides a 30-day limitation for the bringing of an action. Oceanic contends that the applicable statutory period is the 5-year limitation of HRS § 231-23, not the 30-day limitation of HRS § 40-35. A short answer to the contention is that Oceanic did not make such contention in the circuit court.

Counsel for Oceanic stated in the circuit court: "Your Honor, I have done quite a bit of research on this point and the law seems to be that where the statute provides a method for bringing suit against the state for recovery of taxes, that the failure to follow the method is deemed by many courts to be a waiver of your rights. Now, the method pro-

vided in Section 40-35 of the present statute does require bringing of suit within thirty days of payment. I have found nothing in the equity of this particular case which would justify really a going beyond that. So I'm afraid that under the circumstances, I do not have an argument against the state's proposition of them."

The main appeal involves the application of HRS §§ 237-23(a)(7) and 237-23(b)(3) to the facts in this case.

HRS § 237-23 (a) (7) exempts a corporation "organized and operated exclusively for * * * scientific, or educational purposes," from the general excise tax law. However, that exemption is limited by § 237-23(b)(3), and applies only to the corporation's scientific and educational activities as such and not to "any activity the primary purpose of which is to produce income even though the income is to be used for or in furtherance of the exempt activities * * * ."

Oceanic is a nonprofit corporation incorporated under R.L.H. 1955 § 172-16, presently HRS § 416-19, for the advancement of research and education in marine sciences.

The activity of Oceanic, which is in question here, is the making, on December 17, 1963, of an agreement designated as "Construction and Operation Agreement", with Sea Life, Incorporated. The nomenclature given to the agreement is immaterial. In essence, the agreement is a sublease. So, in this opinion, it will be referred to as a sublease.

On October 19, 1962, Oceanic obtained from the State of Hawaii a lease to 118 acres of Kaupo State Park, at Waimanalo, Oahu, being General Lease No. S-3709. The lease is for 65 years, at the following rental during the first 20 years: $12,000 or 1.2 per cent of gross sales and business transacted annually, whichever is higher. Rentals during the balance of the term are to be adjusted at 10-year intervals by appraisal pursuant to HRS § 171-17.

An essential requirement of the lease was that Oceanic construct, or cause to be constructed, a scientific research facility, and a public exhibiting facility, of sea life, during the first three years of the term at a cost of not less than

$1,200,000, with at least $120,000 allocated to research facility, that the facilities be comparable in capacity, quality, and variety to similar first-class facilities in this country, and that their construction be such as to harmonize with the natural beauty of the surrounding terrain and nearby sea.

The lease permitted Oceanic to sublease the exhibiting facility to a subsidiary corporation, with the right in the sublessee to charge admission fees, and to sublease other portions of the demised premises for restaurants, gift shops, and similar facilities. The sublease to Sea Life was made pursuant to this permission.

The sublease covers 20.014 acres of the land demised in General Lease No. S-3709. It is for an initial term of 19 years, with option to renew for additional 10-year periods during the term of the basic lease. The rentals during the initial term are as follows: $30,000 per year in 1964 and 1965; $60,000 per year in 1966 and 1967; $120,000 in 1968; beginning with the year 1969 and each year thereafter, $120,000 or 12 percent of gross annual receipts, whichever is higher. Rentals during the renewed periods are set by negotiation, or by arbitration in case of failure to agree.

In addition to the payment of rentals, the sublease required Sea Life to construct the research and exhibiting facilities which Oceanic was required to construct under the basic lease, and to permit Oceanic to use all exhibiting and supporting facilities for research purposes.

Following the execution of the sublease, Sea Life constructed the required research and exhibiting facilities, and has otherwise performed its covenants thereunder; and, with the use of the facilities thus made available, Oceanic has conducted, and conducts on a continuing basis, a substantial volume of research and educational activities in marine sciences.

The general excise taxes paid under protest by Oceanic were taxes assessed by the director upon Oceanic's rental receipts under the sublease. The director made the assessments on the ground that such receipts were derived from

an activity the primary purpose of which was to produce income.

In holding in favor of Oceanic, the circuit court stated: "Based on the evidence adduced, we conclude that the primary purpose of the plaintiff's entering into the construction and operating agreement was to complete the display and research facilities necessary to the basic functions of the plaintiff, which facilities it was required to construct or cause to be constructed under its lease from the State of Hawaii."

Treated as a finding of fact, the statement of the circuit court is not clearly erroneous. It is amply supported by the record, which shows the following:

Oceanic was founded by Taylor Pryor, a biologist whose principal interest is sea life. Upon his visits to Marineland in Los Angeles, Seaquarium in Miami, and Marine Studios in St. Augustine, he was surprised that their facilities were not used for research. He conceived a plan to conduct research in marine sciences with the use of similar facilities, but faced the problem of financing the construction of facilities, and found a solution in the sublease.

An appearance that the sublease was aimed primarily at income production is given by the substantial rental payments provided therein. But the financial statement in the record, covering the four years between 1965 through 1968, shows that sublease rentals constituted only a small fraction of Oceanic's total revenues during those years. The total revenues during the four years were $2,637,689, of which $270,000, or only 10.2 percent, was derived from the sublease, and $2,367,689 came from grants, donations, contracts, consulting fees, and other non-rental sources. Even in 1968, when the sublease rental was $120,000, it was only 12.5 percent of the total revenues of $955,400 for the year.

We are not concerned here with a sublease having a single purpose of income production. Our concern is with a sublease which had a dual purpose, of which, in addition to production of income, there was the objective of obtaining

the construction of research and educational facilities. In the light of the evidence in the record, we cannot say that the circuit court erred in finding that the latter was the primary purpose of the sublease.

The sole question for decision in this case is whether Oceanic's rental receipts, which were claimed by the director to be taxable, were derived from an "activity the primary purpose of which is to produce income * * * ". The questioned receipts were derived from the sublease. The finding of the circuit court that the primary purpose of the sublease was to obtain the construction of the required research and educational facilities involves a converse finding that income production was not its primary purpose. Thus, the finding disposes of the issue in this case.

Affirmed.

*Johnson H. Wong*, Deputy Attorney General (*Bertram T. Kanbara*, Attorney General, with him on the briefs) for defendant-appellant, cross-appellee.

*Arthur B. Reinwald* (*Anthony & Waddoups* of counsel) for plaintiff-appellee, cross-appellant.

CONCURRING & DISSENTING OPINION OF ABE, J.

The majority of this court dismisses the taxpayer's cross-appeal and I agree.

On the appeal of the tax director, the majority of this court affirms the judgment of the trial court that the rental income derived by Oceanic from Sea Life under a sublease is exempt from the general excise tax.[1] I disagree.

In reaching its conclusion this court repeats with approval the trial court's finding that:

"[T]he primary purpose of the plaintiff's entering into the construction and operating agreement was to complete the display and research facilities necessary to the

---

[1]Then, under the decision of this court, will all leases executed by the Bishop Estate (founded to further the education of Hawaii's children) to schools, universities, theatres, television and radio stations, bookstores, etc., be deemed "educational activities" and therefore the rental proceeds thereunder be exempt from our general excise tax?

basic functions of the plaintiff, which facilities it was required to construct or cause to be constructed under its lease from the State of Hawaii."

Then this court says that the "sole question for decision in this case is whether Oceanic's rental receipts, which were claimed by the director to be taxable, were derived from an 'activity the primary purpose of which is to produce income * * *' ".

I.

It appears that this court is conveniently or purposely skirting around the basic issue of this case. *Is the rental income derived from the educational activity of the taxpayer?*

HRS § 237-23(b)(3)[2] provides tax exemption for the gross income of an otherwise exempt taxpayer only if two tests are met: First, the activity that generated the income must be "the . . . *educational* . . . activities of the [taxpayer]." And second, the income must not be produced by "any activity the primary purpose of which is to produce income even though the income is to be used for or in the furtherance of the exempt activities of such persons."

The first statutory test requires that the gross income to be tax exempt must be derived from the *educational* activity of such person and this requires a finding of "what is the activity." This finding of "what is the activity" encompasses both *isolating* the activity that produced the income and then *characterizing* it as educational or noneducational. Thus the initial question becomes exactly *what* activity generated Oceanic's income. There appears to be no argument that Oceanic received the income now under contention *in*

---

[2]HRS § 237-23(b)(3) reads:

"(b) The exemptions enumerated in subsection (a)(6) to (9) shall apply only:

(3) To the fraternal, religious, charitable, scientific, educational, communal, or social welfare activities of such persons, or to the activities of such hospitals, infirmaries, and sanitaria as such, and not to any activity the primary purpose of which is to produce income even though the income is to be used for or in furtherance of the exempt activities of such persons.

*return* for leasing certain property. Thus, the question would seem to be whether the leasing activity can be characterized as educational.

While this court looks through the nomenclature of "Construction and Operation Agreement" and holds that the taxpayer and Sea Life entered into a sublease, amazingly, this court does not recognize the activity being questioned for this tax purpose *as this same leasing activity* and takes great pains to re-focus the inquiry elsewhere.

This court states that it is "not concerned here with a sublease having a single purpose of income production. Our concern is with a sublease which had a dual purpose, of which, in addition to production of income, there was the objective of obtaining the construction of research and educational facilities."

While the "construction and operation of research and educational facilities" may or may not be educational, it is clear that the taxpayer did not sell any merchandise or perform any service in connection therewith to derive any income from such activities. Further, it is not an act to be performed by the taxpayer; it is a duty, responsibility or liability assumed by Sea Life. Thus, how can it be said that the activity being taxed is the "construction and operation of the research and educational facilities"? It must be emphasized that the tax is not being levied on Sea Life but on Oceanic — the taxpayer.

Here, it must not be forgotten, the subject of the tax is the rental received by the taxpayer from Sea Life under the provisions of the sublease. The activity that produces the rent is the permitted use of the premises by Sea Life under the sublease. In other words the rental is solely in consideration for the permitted use of the premises under the sublease by Sea Life in its commercial activities or undertaking. It appears to me that it would be absolute nonsense to say that Sea Life is paying the rental fixed in the sublease as consideration for its obligation to construct and operate the "research and educational facilities", which entails on-

ly expenditures and no receipt.

It is clear to me that the activity that produces the rental, the subject of the tax, is the permitted use of the premises by Sea Life under the sublease. Thus, the basic issue to be decided here is whether the sublease of the premises falls within the educational activity of the taxpayer.

While the phrase "educational" activity does not lend itself to easy mechanical definitions and certainly education is not limited to areas bordered by the traditional concept of a classroom, *Wilhoit v. Fite*, 341 S.W.2d 806, 816 (Mo. 1960), it would seem that such activity would require the transference of knowledge by "methodical instruction." *Bohemian Gymnastic Ass'n Sokol of City of N.Y.* v. *Higgins*, 147 F.2d 774, 776 (2nd Cir. 1945). And though often one learns a great lesson from property transactions such knowledge is not derived from methodical instructions. Thus, in my opinion the leasing of the premises by Oceanic to Sea Life cannot be characterized as educational activity and does not meet the first statutory test and therefore the rental proceeds derived from the lease should be subject to our general excise tax.

II.

Separate and independent from the first test, *i.e.*, characterizing the activity, the second test inquires as to the purpose of the activity that generates the income. The provision is crystal clear that the exemption is not to apply "to *any* activity the *primary purpose of which is to produce income.*" (Emphasis supplied.) Thus, even assuming that the leasing activity may be deemed "educational," under the second test the rental proceeds may still be taxable if the *primary purpose* of the sublease transaction *is to produce income.*

On this point the trial court made a finding without any basis in the record. In reviewing the rent money based on the public exhibitions the court assumed that "[t]he rev-

enues generated from admission charges to run the exhibitions would have been exempt to Oceanic if operated directly by it." Further, it held "that the interposition of an agreement between plaintiff and Sea Life did not convert the exempt activities into one primarily to produce income."

The assumption by the trial court that the proceeds would have been exempt if Oceanic operated the exhibitions directly instead of Sea Life may not be correct. Under HRS § 237-23(b)(3) if the primary purpose of that activity, though it may be deemed an "educational activity," were to produce income, the gross proceeds would be taxable.

In cases such as these the objective standard to be used by the court should be the basic inquiry of whether the activity contemplates a "profit." *If it does the income should be presumed taxable.* A moment's reflection will indicate why. *Generally,* the primary purpose of an organization offering the sale or rental of goods and services is for one of two reasons: either to make them available to the consumer or to make money. If the primary purpose is to make the goods or services available to the consumer then any "profit" motive, no matter how slight, merely hinders the achievement of this goal, because by foregoing profit the price can be lowered and correspondingly more people will be able to partake of the same.

On the other hand, if the primary purpose is to produce income for other uses, then a profit is absolutely necessary to achieve this goal. Therefore the evidence of a "profit" motive should raise the presumption that the primary purpose of the activity was to produce income and thereby derive a profit.

On this point the sublease agreement clearly points to Oceanic's intent. Instead of setting the rent on a *cost basis,*[3]

---

[3]Oceanic's semi-annual rental payments to the State are only $6,000 or 1.2% of gross. It should also be emphasized here that under the terms of the sublease the taxpayer is assured of a gross profit of at least ten times its rental cost.

Sea Life is required to:

"* * * pay to the Foundation for the privileges and concessions herein granted to it, in semi-annual installments commencing January 1, 1964, and on the first day of July and January of each year thereafter until January 1, 1969, a sum equal to 1.2% of the gross revenue of Sea Life for the preceding six (6) months, but in no event less than the following semi-annual minimum payments:

January 1 and July 1 of 1964 and 1965: $15,000
January 1 and July 1 of 1966 and 1967: $30,000
January 1 and July 1 of 1968: $60,000

Commencing January 1, 1969, and on July 1 and January 1 of each year thereafter, during the terms of this agreement, Sea Life shall pay to the Foundation a sum equal to 12% of the gross revenue of Sea Life for the preceding six (6) months, or $60,000, whichever is higher."[4]

It should be noted that this rental provision is substantially the same as rental covenants contained in regular commercial leases entered into by landowners for the sole purpose of deriving income and profit. Further, it appears that the rental of 12% of the gross revenue is higher than most percentage rental fixed in such leases.

On this point, interestingly, counsel for the taxpayer stated to this court that Sea Life was finding the rental of 12% of the gross revenue too onerous and that renegotiation on the rental was contemplated.

As I have stated in Part I, I believe the activity which produces the rental, which is the subject of the tax, is the transaction whereby the taxpayer permits Sea Life to use the premises. Also, the obligation incurred by Sea Life "to construct and operate the research and educational facilities" is additional consideration to be performed by Sea Life in exchange for this same permitted use of the premises. In other words, Sea Life agreed to pay the rentals pro-

---

[4]This provision appears on page 2 of the agreement under subtitle "3. Payments to the Foundation."

vided for in the sublease and also agreed "to construct and operate the research and educational facilities" as consideration for the use of the premises. Then, there is no question that the construction and operation of such facilities inure to the benefit of the sublessor (Oceanic). Also, the performance by Sea Life of its undertaking under the sublease fulfilled the requirement of Oceanic under the State lease.

I don't think it is unreasonable to assume that Sea Life would have been willing to pay a higher monetary rental (whether in form of fixed minimum or percentage) if it were not required to assume the obligation of constructing and operating such facilities. Now, inasmuch as the taxpayer benefits from the performance of this obligation by Sea Life, and as it is without question additional consideration for the permitted use of the premises, it would appear to me that the annual non-cash benefits which inure to the taxpayer should be reduced to monetary figure by amortization formula or otherwise and taxed as rental together with the cash realization.

Now, if a lessee is required to pay in addition to certain fixed rental the real property tax, the real property tax so paid is considered as part of the rental received by the landlord. Then, if under a term of lease, the lessee is required to pay for the education of a landlord's son, wouldn't such payment for education be taxable as additional rental? In the second hypothetical case, landlord would not receive money but he would be receiving the benefits as he would not be required to pay for his son's education. In other words, there a lessee had assumed the obligation of educating the lessor's son. Here, Sea Life has assumed the taxpayer's obligation (as lessee under the State lease) to "construct and operate research and educational facilities," whereby the taxpayer is relieved from making substantial expenditures. There is no question that because of this assumption of obligation by Sea Life, the taxpayer receives substantial benefits. Should the non-cash benefits to this

sublessor be treated any differently from other non-cash benefits such as payment of lessor's property taxes or the education of lessor's son?

Here, the taxpayer by shifting its obligation to Sea Life received substantial benefit and I can see no reason that this benefit to the taxpayer should be treated differently. Hence, the benefits[5] received should be reduced to an annual monetary figure and be taxed.

Thus, even assuming that the trial court and this court are correct in their conclusion that the sublease was entered into for "the construction and operation of the research and educational facilities," clearly the object of the sublease is to provide income. Firstly, to have Sea Life pay the monetary rental; and secondly, to have Sea Life assume the obligation of "constructing and operating the research and educational facilities," and eliminate the necessity of raising and expending substantial sums of money for those purposes and thereby indirectly deriving an income.

It would appear to me the sublease in question is no different from any commercial lease where a lessee is required to construct improvement and also to pay rental for the permitted use of leased premises. However, it appears that this court in its anxiety to afford a tax exemption to the taxpayer is placing blinders upon itself so as not to see beyond what the taxpayer wants the court to see and to see no further than the trial court did on this issue. Otherwise, how can this court equate the finding of the trial court "that the primary purpose of the plaintiff entering into the construction and operating agreement was to complete the display and research facilities" to a finding that the subject of the tax — the rental paid and received under the sublease — was not therefore for the primary purpose of producing income.

In my opinion, the sublease was entered into not only for

[5] Of course, the determination may be difficult but I don't think it is impossible.

the primary purpose, but solely for the purpose of deriving an income.

Also, it is uncontroverted that the payments under the sublease are used for research and according to the president of Sea Life is "the whole basis of our ability to work over there." In other words Oceanic entered into the lease transaction intending to make a profit thereby and to use such profit to finance its scientific and research programs. Thus, I believe the income derived by Oceanic under the construction agreement with Sea Life does not come within the exemption of HRS § 237-23(b)(3) and the income is taxable under the general excise tax law.