In the Matter of the Tax Appeal of CENTRAL UNION CHURCH — ARCADIA RETIREMENT RESIDENCE, Taxpayer

NO. 6684

MARCH 4, 1981

RICHARDSON, C.J., OGATA, MENOR, LUM AND NAKAMURA, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

The issue in this taxpayer appeal from the Tax Appeal Court is whether certain sums derived from the operation of a retirement home by a church are subject to taxation under HRS Chapter 237, the general excise tax statute. Finding the receipts in question are

exempt from taxation thereunder, we reverse the Tax Appeal Court's decision and order.

The taxpayer, Central Union Church — Arcadia Retirement Residence (hereafter Arcadia), filed a general excise tax return for the month of January, 1977, claiming exemptions from taxation for entrance fees, monthly service fees, and health care center fees paid by residents. The claimed exemptions of entrance and monthly service fees were disallowed by the Department of Taxation, but the claim of exemption of health care center fees was allowed. Arcadia paid the taxes assessed by the notice of assessment and filed a timely appeal to the Tax Appeal Court. After a hearing, the court entered judgment in favor of the Director of Taxation. The taxpayer has appealed, contending Central Union Church is generally exempt from coverage under HRS Chapter 237 pursuant to § 237-23(a)(6)[1] and its operation of a retirement home for aged persons is an activity exempt from taxation pursuant to § 237-23(b)(3).[2] Therefore, it

---

[1] HRS § 237-23(a) reads in relevant part:
This chapter shall not apply to the following persons:

. . . .

(6) Corporations, associations, trusts, or societies organized and operated exclusively for religious, charitable, scientific, or educational purposes, as well as that of operating senior citizens housing facilities qualifying for a loan under the laws of the United States as authorized by section 202 of the Housing Act of 1959, as amended by the Housing Act of 1961, the Senior Citizens Housing Act of 1962, the Housing Act of 1964, and the Housing and Urban Development Act of 1965 as well as that of operating a prepaid legal services plan. . . .

[2] HRS § 237-23(b) reads:
(b) The exemptions enumerated in subsection (a)(5) to (8) shall apply only:
(1) To those persons who shall have registered with the department of taxation on or before January 31 of each calendar year, or within one month after the commencement of business, by filing a written application for registration in such form as the department shall prescribe, and shall have paid for the registration an annual fee of $1, and shall have had the exemption allowed by the department or by a court or tribunal of competent jurisdiction upon appeal from any assessment resulting from disallowance of the exemption by the department; and
(2) To activities from which no profit inures to the benefit of any private stockholder or individual, except for death or other benefits to the members of fraternal societies; and
(3) To the fraternal, religious, charitable, scientific, educational, communal, or social welfare activities of such persons, or to the activities of such hospitals, infirmaries, and sanitaria as such, and not to any activity the primary purpose of which is to produce income even though the income is to be used for or in furtherance of the exempt activities of such persons.

asserts the receipts in question are not subject to taxation under Chapter 237.

The dispositive questions are:

(1) Whether Central Union Church's operation of Arcadia is exempted from general excise taxation as a charitable activity; and

(2) Whether the entrance and monthly service fees received from residents of Arcadia are derived from an "activity the primary purpose of which is to produce income."

## I.

Central Union Church, a religious organization exempted from coverage under the general excise tax law by HRS § 237-23(a)(6),[3] owns and operates Arcadia as a "non-profit, self-supporting" retirement residence that provides housing, meals, limited nursing care, and other essential services to enable its elderly residents to live independently and safely. Arcadia is a non-profit operation in that no profit therefrom inures to the benefit of the church or any person;[4] it is a self-supporting operation in that its operating expenses are primarily derived from fees charged residents. The construction of the residence was financed through loans from non-federal sources[5] since the church did not qualify for a loan under Section 202 of the Housing Act of 1959, as amended by the Housing Act of 1961, the Senior Citizens Housing Act of 1962, the Housing Act of 1964, and the Housing and Urban Development Act of 1965.

Ordinarily, only those elderly persons who are able to pay established charges and also are ambulatory and reasonably healthy are considered for admission. Prior to admission, residents execute "lifetime care agreements" with Arcadia and pay stipulated lump

---

[3] It is also exempt from Federal and State income taxes as a non-profit organization.

[4] Financial statements prepared by Arcadia's accountants for the period ending December 31, 1976 indicate a sponsor's (Central Union Church's) deficit of approximately $1,000,000.00.

[5] Arcadia's mortgage indebtedness under first and second mortgage notes held by the Employees Retirement System of the School District of Detroit and the Hawaiian Dredging & Construction Company amounted to $3,136,220.00 at the end of 1976.

sum entrance fees. These fees represent payments for lifetime leases of apartments, and the payments vary with the accommodations furnished. Residents are also assessed monthly service fees to cover the home's operating costs and health care center fees[6] to cover skilled nursing care for the first five days of an illness. These monthly fees are established annually, in advance, to cover anticipated operational expenses. All fees derived from residents are used exclusively in furtherance of the taxpayer's purpose to provide a home for the aged.

The taxpayer contends Arcadia has an established policy of ·maintaining the resident status of persons admitted to residence, even if they subsequently become ill or unable to pay the monthly charges. The relevant provision of the "lifetime care agreement," however, reads in part:

> Once admitted to occupancy in Arcadia, no resident will be asked to leave for lack of funds, *provided* the Resident has not depleted by willful or purposeful act, or by state of mental disorder or confusion, or through unreasonable persuasion, his assets, which are the source of funds used for payment of monthly service charges and Health Care charges.

## II.

The general excise tax, originally enacted in 1935 to replace the short-lived business excise tax which was passed in 1932 at the height of the Great Depression, is the State's principal source of governmental revenue. *See* R. Kamins & Y. Leong, *Hawaii's General Excise Tax,* Leg. Ref. Bur. Rep. No. 2, 1963, 1-15. In form, it is a tax imposed upon entrepreneurs for the privilege of doing business; in effect, it is more. It has been characterized as "an amalgam of consumption, business and income taxation," for the ultimate burden is often shifted forward to consumers. R. Kamins & Y. Leong, *supra,* at 20. The tax applies at all levels of economic activity from production or manufacturing to retailing, albeit at different rates, and to virtually all goods and services. Its inherent pervasiveness, however, is mitigated by limited categories of exemptions from

---

[6] The monthly health care center fees are not at issue here.

coverage provided for certain persons or entities, certain activities, and described transactions.[7]

HRS § 237-23(a)(6) excludes entities organized and operated for religious, charitable, scientific, or educational purposes from coverage under the general excise tax law; it also excludes organizations operating senior citizens housing facilities if they qualify for federal loans under Section 202 of the Housing Act of 1959, as amended. The exemptions are, however, confined by HRS § 237-23(b) to the fraternal, religious, charitable, scientific, educational, communal, or social welfare activities of the foregoing organizations from which no profit inures to anyone; none is allowed for "any activity the primary purpose of which is to produce income even though the income is to be used for or in furtherance of the exempt activities." In effect, the gross income of an exempt organization derived from an activity which is not deemed an exempted activity by § 237-23(b) is subject to taxation.

As noted, the plea for avoidance of taxation here is premised on the foregoing provisions of HRS Chapter 237. Central Union Church regards its operation of Arcadia as a "charitable" activity conducted by an exempt organization and the receipts in question as being derived from the activity, not from another activity whose primary purpose is to produce "income." The Director of Taxation does not view Central Union's operation of Arcadia so generously. Reading § 237-23(a)(6) narrowly, he sees no general exemption provided thereby for non-profit retirement residences. He construes the foregoing subsection as specifically exempting only those homes for the aged qualifying for construction loans under the federal housing programs designated in § 237-23(a)(6). His further response to the taxpayer's argument is that Central Union's "charitable" aims in this situation do not extend far enough to warrant an exemption because the entrance fees and monthly charges render Arcadia's facilities and services unavailable to those afflicted with poverty. Moreover, he does not see Arcadia as being fully committed to a policy of maintaining the resident status of persons who subsequently become unable to pay regular charges. We do not read § 237-23(a)(6) or view charity as narrowly as the director.

---

[7] *See* HRS §§ 237-23, 237-3, 237-22, and 237-24 to 29.

## A.

Charity has traditionally been associated with the relief of poverty. But contemporary notions of philanthropy embody much broader objectives; a "charitable" purpose now undoubtedly embraces a wide range of activities. Nowhere is this more clearly evident than in our tax laws, particularly in federal income tax legislation which exempts from taxation numerous organizations, both religious and secular, whose activities extend far beyond relief for the poor. *See* 6 J. Mertens, *Law of Federal Income Taxation* § 34.09, at 40-53 (1975). The term "charitable" as applied there includes the relief of the poor and the distressed or of the underprivileged and the disadvantaged; it covers numerous private endeavors generally beneficial to communities, especially those activities designed to alleviate problems that may otherwise become the responsibility of government. *Id.*

The elderly have been recognized as a disadvantaged and distressed group with definite needs calling for special attention. Poverty is "only one form of distress to which the elderly as a class are particularly susceptible." Rev. Rul. 79-19, 1979-1 C.B. 195, 196. Both Congress and the state legislature have acknowledged a duty and responsibility to enable aged persons to lead more secure and independent lives. *See* the Older Americans Act of 1965, Pub. L. No. 89-73, § 101, 79 Stat. 219; HRS Chapter 349, S.L.H. 1976, c. 217.[8]

---

[8] Section 101 of Pub. L. 89-73 and HRS § 349-1 contain substantially similar declarations that there is a governmental responsibility to enable older people to secure "equal opportunity to the full and free enjoyment of . . . [s]uitable housing, independently selected, designed, and located with reference to special needs and available at costs which older citizens can afford." The governmental responsibility and commitment to the elderly was reiterated by the legislature in 1976 when it established an Executive Office On Aging. The findings and declaration of necessity accompanying the pertinent legislation stated in part:

The State of Hawaii, perhaps more than any other jurisdiction in the United States, has been in the forefront in the enactment of legislation designed to assist the elderly. More than a decade ago, the state legislature enacted Act 198, Session Laws of Hawaii 1963, which created the state commission on aging and correspondingly county committees on aging to advise and assist all levels of government in the formulation and implementation of programs to meet the specific needs and requirements of Hawaii's elderly population. Act 198 preceded the passage by the Congress of the Older Americans Act of 1965 which provided

Among the entitlements of the elderly delineated in the Older Americans Act and HRS Chapter 349 are "[s]uitable housing, independently selected, designed, and located with reference to special needs and available at costs which older citizens can afford . . . [and] [r]etirement in health, honor, and dignity."

Private efforts to provide food, shelter, health care, and other services to enable aged persons to live independently and safely are clearly consonant with the foregoing policies and goals, even though the efforts may be focused on the needs of the middle class elderly. And where a religious organization undertakes even a small part of a task that has been declared a responsibility of government, there is no reason to presume the legislature would be niggardly in exempting those aspects of the operation not designed to generate income or profit from payment of the general excise tax, a tax levied on the privilege of doing "business." We are also influenced in this regard by a realization that the tax in this case would, in all probability, be shifted forward to Arcadia's aged residents, for a non-profit operation would be incapable of absorbing it.

B.

The director maintains the provisions of § 237-23(a)(6) only exempt a limited class of retirement residences, those qualifying for

---

federal financial support for state and local elderly program planning and development.

In support of its commitment to make the lives of the elderly more secure and enduring, the legislature enacted Act 261, in 1965. This Act marked the formal recognition of Hawaii's elderly population, including articulation of the State's goal, duty, and responsibility to its aged people. Briefly stated, the declared goal of the State of Hawaii is ". . . in keeping with the traditional American concept of the inherent dignity of the individual in our democratic society, the older people of our State are entitled to, and it is the joint and several duty and responsibility of the State of Hawaii and its counties to enable our older people to secure equal opportunity to the full and free enjoyment of . . ." and adequate income in retirement, the best possible physical and mental health, suitable housing, full restorative services for those who require institutional care, opportunity for employment with no discriminatory personnel practices because of age, pursuit of meaningful activity within the widest range of civic, cultural, and recreational opportunities and freedom, independence, and the free exercise of individual initiative in planning and managing their own lives. S.L.H. 1976, c. 217, Section 1.

loans "under the laws of the United States as authorized by section 202 of the Housing Act of 1959, as amended." He reminds us the question here concerns exemption from taxation rather than the imposition of a tax and that exemptions must be strictly construed against taxpayers, citing several decisions emanating from this court, including *In re Pacific Marine & Supply Co.*, 55 Haw. 572, 524 P.2d 890 (1974); *Honolulu Star Bulletin, Ltd. v. Burns,* 50 Haw. 603, 446 P.2d 171 (1968); and *In re Taxes, Johnson,* 44 Haw. 519, 356 P.2d 1028 (1960). The taxpayer counters with a rule of statutory construction to the effect that exemptions in favor of charitable organizations should be liberally construed, citing 3 C. Sands, *Sutherland on Statutory Construction* § 63.08, at 96 (4th ed. 1973).

We are familiar with the rules employed in the director's thrust and in the taxpayer's parry, particularly the rule of strict construction on exemptions, for we have often recognized its force and salutary nature. But even the rule of strict construction does not compel an immediate surrender to its dictates whenever an ambiguity arises, since it functions as an element of decision only after "other tests of meaning have been employed which experience has afforded, and which it is the duty of courts to consider when rights are claimed under a statute." *Citizens Bank v. Parker,* 192 U.S. 73, 86 (1904); *see also Antilles Industries, Inc. v. Gov't. of the Virgin Islands,* 388 F. Supp. 315, 318 (D.V.I. 1975). As we recently said, "the rule of strict construction with regard to taxing statutes should only be resorted to 'as an aid to construction when an ambiguity or doubt is apparent on the face of the statute, and then only after other possible extrinsic aids of construction available to resolve the ambiguity have been exhausted.' " *In re Tax Appeal of Hawaiian Telephone Company,* 61 Haw. 572, 578-79, 608 P.2d 383, 388 (1980) (citations omitted).

The director's interpretation of § 237-23(a)(6) is based in part on his reading of a legislative committee report issued in conjunction with the passage of Act 159, S.L.H. 1967, which amended the relevant statute by adding a specific exemption for senior citizens housing facilities qualifying for designated federal loans. Interestingly, the same report is quoted to buttress the taxpayer's argument. The report reads in pertinent part:

> The purpose of this bill is to enlarge the exemption from the general excise tax given to corporations, associations, and socie-

ties organized for religious, charitable, scientific or educational purposes by allowing such exemptions to extend to the operation by such exempt organizations of senior citizens housing facilities which qualify for loans under certain laws of the United States. It is not the intent of this bill to exempt from general excise taxes any senior citizens housing facility not operated by the entities enumerated in section 117-20(g). (Now HRS § 237-23(a)(6)).

Hse. Stand. Comm. Rep. No. 581, in 1967 House Journal, at 694. But neither the language of Act 159 nor the foregoing committee report supports a conclusion that the legislature thereby intended to foreclose a possibility of other housing facilities for elderly persons ever achieving exempt status. Nor do they intimate the legislation's purpose was to constrict other exempt categories of activity. Quite to the contrary, the report states the purpose was to "enlarge the exemption." We further fail to see the logic of the proposition inherent in the director's position that only federally sponsored efforts to assist elderly persons with their housing problems deserve relief from general excise taxation. We agree with the taxpayer that Act 159 did not serve to restrict exemptions for non-profit housing endeavors for the elderly to a narrowly defined class of "facilities qualifying for a loan under the laws of the United States as authorized by section 202 of the Housing Act of 1959, as amended."

The director further asserts Arcadia's actual practice and policy regarding the admission and retention of residents do not substantiate a claim of charitable status. Its practice of accepting only those who are fully able to pay established entrance fees and monthly charges, in his view, belies an avowed charitable purpose. He also contends Arcadia's professed aim of providing lifetime security for elderly persons is not supportable even if the "lifetime care agreement" declares that "[o]nce admitted to occupancy in Arcadia, no resident will be asked to leave for lack of funds. . . ." In the director's opinion, the reservation of a right to evict residents whose impecunious state is induced by a willful depletion of assets, "unreasonable persuasion," or "mental disorder or confusion" invalidates the proclamation of "lifetime security."

Proverbially, charity should know no bounds; practically, it must often be tempered by available means. The limitations placed on Central Union's charity, in our opinion, are not such that would annul a basically charitable purpose. Moreover, we do not believe

HRS §§ 237-23(a)(6) and 237-23(b)(3) should be applied so strin-
gently as to serve as a disincentive for other religious and charitable
organizations to engage in efforts to assist the elderly with their
housing needs. However, we do not mean to imply that all enter-
prises providing residential accommodations and other services for
the elderly, even when conducted by religious organizations, are
charitable activities.[9] Exempt status still turns on the absence of a
profit motive and the presence of an altruistic goal.

### III.

In contrast to the taxpayer, the director does not regard Arcadia
as a single activity for relevant purposes. He states "[t]here are two
activities at issue" here and argues the entrance fees represent "the
sale of lifetime leases" and the monthly charges constitute "the sale
of life-care services." Even assuming their semantic accuracy, the
foregoing characterizations do not provide a sound basis for deny-
ing the requested taxpayer relief.

*The Oceanic Foundation v. Kondo,* 53 Haw. 1, 486 P.2d 396 (1971),
where a somewhat similar issue was presented, involved a non-profit
corporation organized to pursue scientific and educational objec-
tives, both recognized as exempt purposes. To further these goals,
Oceanic leased 118 acres of land at Waimanalo, Oahu, from the
State of Hawaii. The terms of the lease included a requirement that
Oceanic construct a scientific research facility and a public exhibi-
tion facility featuring marine life. In order to effect the construction
and financing of these facilities, Oceanic subleased a portion of the
leased land and entered into a "Construction and Operation
Agreement," with a subsidiary corporation, Sea Life, Incorporated.
Pursuant to the sublease agreement, Sea Life constructed the fore-
going facilities, as well as a restaurant and gift shop facility, and
operated the exhibition facility, where admission fees were charged,
and the restaurant and gift shop. Oceanic also used the exhibition
facility to conduct research. In consideration of the sublease, Sea

---

[9] *See* Note, *Continuing Care Communities for the Elderly: Potential Pitfalls and Proper
Regulation,* 128 U. Pa. L. Rev. 883-936 (1980), for a discussion of various enterprises
providing residential accommodations for the elderly. Most of them could not be
considered charitable activities.

Life agreed to pay substantial sums in rent to Oceanic. The question was whether the sums received as rent by Oceanic were exempted from payment of the excise tax.

While the transaction gave the appearance of being "aimed primarily at income production," the circuit court found the rents received were not subject to taxation because the primary purpose of the sublease was to secure the construction of research and exhibition facilities as required by Oceanic's agreement with the State of Hawaii. Finding that this was substantiated by the record, we affirmed the circuit court's decision. The rationale for our conclusion was stated as follows:

> We are not concerned here with a sublease having a single purpose of income production. Our concern is with a sublease which had a dual purpose, of which, in addition to production of income, there was the objective of obtaining the construction of research and educational facilities. In the light of the evidence in the record, we cannot say that the circuit court erred in finding that the latter was the primary purpose of the sublease.

53 Haw. at 5-6, 486 P.2d at 398. Thus, the primary purpose of the transaction was deemed controlling.

The record in this case discloses the entrance fees are applied to amortize Arcadia's funded and unfunded capital costs; it reveals the monthly service fees are applied to cover operating costs. That these receipts flow from the operation of Arcadia itself rather than from another activity with a different purpose is obvious. Nor is there any question that the primary, if not the exclusive, purpose of the relevant transactions is to further Arcadia's objective of providing housing and other services for elderly persons, and not to produce "income."

Reversed.

*George G. Grubb (Carlsmith, Carlsmith, Wichman & Case,* of counsel) for taxpayer-appellant.

*Allan S. Chock (Harriet Yoshida Lewis* on the brief), Deputy Attorneys General, for Director of Taxation-Appellee.