In the Matter of the Tax Appeal of HABILITAT, INC., Taxpayer

NO. 7048

(CASE NO. 1766)

AUGUST 18, 1982

RICHARDSON, C.J.; LUM AND NAKAMURA, JJ.,
RETIRED JUSTICE MARUMOTO IN PLACE OF
MENOR, J., EXCUSED, AND RETIRED JUSTICE OGATA
ASSIGNED TEMPORARILY

OPINION OF THE COURT BY NAKAMURA, J.

HABILITAT, INC. (Habilitat or the taxpayer), a Hawaii non- profit corporation, appeals from a decision and order of the Tax Appeal Court upholding the assessment by the Director of Taxation of general excise taxes on the gross income derived from certain of its activities and of use taxes on goods it ordered from out-of-state suppliers for subsequent delivery to other persons in Hawaii. It claims the gross income in question is exempt from taxation pursuant to several provisions of HRS Chapter 237 and its ordering of goods for delivery to others in Hawaii did not subject it to taxation pursuant to HRS § 238-2(1). From a review of the record, we are convinced that the gross income in question for the fiscal years ending in June of 1974, 1975, and 1976, except for the "rent" received from Habilitat's residents and staff, was properly taxed and that the purchases from out-of-state suppliers were subject to the use tax.

I.

Habilitat's primary activity is rehabilitation; it maintains a residential program to foster the rehabilitation of persons with character disorders, including those induced or complicated by drug or alcohol abuse. It is exempted from the payment of federal income taxes as a charitable and educational organization within the purview of § 501(c)(3) of the Internal Revenue Code. It has also been recognized by the Director of Taxation since 1977 as an exempt

organization for purposes of the general excise tax law.[1] Habilitat's operation is funded from various sources, including government grants, food stamps, the Aloha United Fund, interest and dividend income, and activities conducted by the organization.

The present controversy arose on October 11, 1977 when the Director of Taxation served a Notice of Assessment of Additional General Excise and Use Taxes for the fiscal years ending June 1974, June 1975, and June 1976 on the taxpayer, whereby general excise taxes in the sum of $39,799.91 in addition to taxes theretofore paid for those years were assessed and use taxes in the sum of $3,647.87 for the same period were assessed. The notice also included assessments of penalties and interest in addition to the unpaid taxes. The excise taxes were levied on gross income derived by the taxpayer from the following activities and sources:

(1) Retailing — gross income derived from Habilitat's sales of tangible personal property such as "advertising specialty items", wood products, candles, cookbooks, donated goods, matches, and posters.

(2) Services — gross income derived from the performance of work on construction projects, painting and repair jobs, and landscaping jobs by the residents of Habilitat.

(3) Rentals — gross income derived from Habilitat's operation of various housing accommodations for its residents and staff.

(4) Interest — interest received by Habilitat pursuant to an agreement of sale covering certain real property located in Kaneohe, Hawaii.

(5) Other sources —.

(a) Benefit concerts — gross income derived from benefit concerts conducted on Habilitat's behalf.

---

[1] HRS § 237-23(a) (1976) read in relevant part:
This chapter shall not apply to the following persons:

. . . .

(6) Corporations, associations, or societies organized and operated exclusively for religious, charitable, scientific, or educational purposes, as well as that of operating senior citizens housing facilities qualifying for a loan under the laws of the United States as authorized by section 202 of the Housing Act of 1959, as amended by the Housing Act of 1961, the Senior Citizens Housing Act of 1962, the Housing Act of 1964, and the Housing and Urban Development Act of 1965 as well as that of operating a prepaid legal services plan.

(b) Speaking engagements — gross income derived from the speaking engagements of Habilitat's founder before various community groups.

(c) Consultant fees — gross income derived from the American Alcoholic Treatment Facility in Honolulu in payment for Habilitat's assistance in the former's rehabilitation program.

(d) Vending machines — gross income derived from the operation of vending machines located on Habilitat's premises.

(e) Film income — gross income derived from the public showing of a film produced by Habilitat, "Story of Survival".
The use taxes were levied on the "purchases" by Habilitat of "advertising specialty items" from out-of-state suppliers for delivery to other persons in Hawaii.

Habilitat paid the assessed taxes, penalties, and interest under protest and sought relief from the Tax Appeal Court. The assessments were adjusted in the course of the appeals, resulting in revised assessments of $16,774.36 on account of general excise taxes and $2,307.84 on account of use taxes, together with penalties and interest thereon. The court sustained the revised assessments and entered judgment in favor of the Director of Taxation for the adjusted sums. The taxpayer's appeal to this court followed.

The dispositive questions on the levy of additional excise taxes are whether the receipts in question were from activities of Habilitat exempted from excise taxation pursuant to HRS § 237-23(b) or whether the receipts were from activities with a primary purpose of producing income, "even though the income is to be used for or in furtherance of the exempt activities."[2] A further issue in this regard

---

[2] HRS § 237-23(b) (1976) read:

    (b) The exemptions enumerated in subsection (a)(6) to (9) shall apply only:

        (1) To those persons who shall have registered with the department of taxation on or before January 31 of each calendar year, or within one month after the commencement of business, by filing a written application for registration in such form as the department shall prescribe, and shall have paid for the registration an annual fee of $1, and shall have had the exemption allowed by the department or by a court or tribunal of competent jurisdiction upon appeal from any assessment resulting from disallowance of the exemption by the department; and

        (2) To activities from which no profit inures to the benefit of any private

is whether some of the receipts were gifts rather than taxable gross income. The issue relative to the use tax law is whether Habilitat engaged in taxable transactions when it ordered items of personal property from out-of-state suppliers for direct delivery to persons in Hawaii.[3]

## II.

### A.

The general excise tax, the State's principal source of governmental revenues, is "imposed upon entrepreneurs for the privilege of doing business." *In re Tax Appeal of Central Union Church,* 63 Haw. 199, 202, 624 P.2d 1346, 1349 (1981). It "applies at all levels of economic activity from production or manufacturing to retailing ... and to virtually all goods and services." *Id.* But "[i]ts inherent pervasiveness ... is mitigated by limited categories of exemptions ... provided for certain persons or entities, certain activities, and

---

stockholder or individual, except for death or other benefits to the members of fraternal societies; and

(3) To the fraternal, religious, charitable, scientific, educational, communal, or social welfare activities of such persons, or to the activities of such hospitals, infirmaries, and sanitaria as such, and not to any activity the primary purpose of which is to produce income even though the income is to be used for or in furtherance of the exempt activities of such persons.

[3] HRS § 238-2(1) reads:

Imposition of tax; exemptions. There is hereby levied an excise tax on the use in this State of tangible personal property which is imported, or purchased from an unlicensed seller, for use in this State. The tax imposed by this chapter shall accrue when the property is acquired by the importer or purchaser and becomes subject to the taxing jurisdiction of the State. The rates of the tax hereby imposed and the exemptions thereof are as follows:

(1) If the importer or purchaser is licensed under chapter 237 and is (A) a wholesaler or jobber importing or purchasing for purposes of resale, or (B) a manufacturer importing or purchasing material or commodities which are to be incorporated by the manufacturer into a finished or saleable product (including the container or package in which the product is contained) wherein it will remain in such form as to be perceptible to the senses, and which finished or saleable product is to be sold in such manner as to result in a further tax on the activity of the manufacturer as the manufacturer or as a wholesaler, and not as a retailer, there shall be no tax, provided, that if the wholesaler, jobber, or manufacturer is also engaged in business as a retailer (so classed under chapter 237), paragraph (2) shall apply to him, but the director of taxation shall refund to him, in the manner provided under section 231-23(d) such amount of tax as he shall, to the satisfaction of the director, establish to have been paid by him to the director with respect to property which has been used by him for the purposes stated in this paragraph.

described transactions." *Id.* at 202-03, 625 P.2d at 1349.[4] Among these is the exemption provided by HRS § 237-23(b) for the gross income derived from the charitable, educational, communal, or social welfare activities of an entity organized and operated exclusively for charitable or educational purposes. The exemption, however, does not extend to the proceeds of any activity designed to produce income, even if such receipts are thereafter employed to further the organization's altruistic goals. It applies only where the primary purpose of the particular activity is not to produce income and the activity is also a primary reason for the organization's existence. *Id.* at 208-09, 624 P.2d at 1352-53; *The Oceanic Foundation v. Kondo*, 53 Haw. 1, 5-6, 486 P.2d 396, 398 (1971).

## B.

### 1.

Habilitat argues the gross income generated by the sales of tangible personal property and the performance of work on construction and landscaping jobs by its residents falls within the foregoing exempt category because the activities are expressly designed to aid in the rehabilitation of the alienated individuals who are the beneficiaries of its program. The development of economic self-reliance, it claims, is vital to the program Habilitat has fostered. This factor, it says, distinguishes the activities in question from the situation where a private school whose educational activities have been exempted from taxation pursuant to HRS § 237-23 sponsored a fund-raising carnival. The argument is not without appeal.

Yet, it cannot be denied that the activities have a primary purpose of producing income for Habilitat's operation. And where the object of economic gain predominates, the activity does not meet the exemptive test propounded by. *In re Tax Appeal of Central Union Church*, despite an integration of the economic activity with the purpose for which the entity was organized.

### 2.

The thesis advanced above is reiterated to support the taxpayer's position that the payments received in the form of "rent" from

---

[4] *See* HRS §§ 237-23, 237-3, 237-22, and 237-24 to 29.

Habilitat's residents and staff are not subject to taxation. But here, the argument supports the claim of exemption — a residential setting where stringent rules of conduct are enforceable forms the core of Habilitat's program.

Some of the receipts in question consist of a portion of the welfare benefits received from the State Department of Social Services and Housing (DSSH) to cover food, housing, and other needs of participants in the program. In the initial phase of an individual's rehabilitative process none of the payments received from the DSSH on his account is allocated to "rent", and no issue has been raised about these payments.[5] But as he progresses through the program, part of the payments received from the DSSH on his behalf is allocated to cover housing and designated for bookkeeping purposes as "rent" received from him. The taxpayer objects to the assessment of excise taxes on the portion of the payments designated as "rent". For the designation, it claims, is only intended "to promote a recognition by the residents that they will have to be responsible for such expenses once they leave the program, and to assist . . . [Habilitat] in analyzing the costs of . . . its program." *In re Tax Appeal of Central Union Church, supra,* definitely supports the taxpayer's position here.

The "rent" received from some of Habilitat's employees is also at issue. The persons to whom such payments are attributed, though technically employees, are participants in the program whose rehabilitation is considered nearly complete. They remain as residents of Habilitat, continue to participate in the program, and assist other residents who are still in the early phases of rehabilitation. They receive salaries from which they pay set amounts to help defray the cost of housing them at Habilitat.[6] The monthly "rent" for one of

---

[5] The fact stipulation executed by the parties and presented to the Tax Appeal Court described the transactions in the following manner:

During the initial stages of rehabilitation known as induction, treatment and re-entry, Appellant's residents do not pay any rental for their housing. Appellant receives welfare benefits and food stamps from the Department of Social Services for each resident, and these benefits are paid directly to Appellant to partially cover the costs of rehabilitation, room and board.

[6] The stipulation submitted to the Tax Appeal Court reflects the following facts about this aspect of the case:

The residence facilities also house individuals called gold tags, who continue to participate in Appellant's rehabilitation program, and assist those residents in

these persons is equivalent to the sum allocated for housing an individual in the category described earlier. *In re Tax Appeal of Central Union Church* likewise aids the taxpayer's cause here.

The transactions at issue did not have a primary purpose to produce income; the parties have agreed that "[n]o profit was made by . . . [Habilitat] in connection with these rentals." *See* note 6 *supra*. The sums credited as "rent" here are, in our opinion, analogous to the monthly service fees received from the elderly residents of the retirement residence operated by the Central Union Church which were "applied to cover operating costs" there. *See In re Tax Appeal of Central Union Church, supra,* 63 Haw. at 209, 624 P.2d at 1353.

> That these receipts flow from the operation of . . . [Habilitat] itself rather than from another activity with a different purpose is obvious. Nor is there any question that the primary, if not the exclusive, purpose of the relevant transactions is to further . . . [Habilitat's] objective of providing housing and other services for . . . [the participants in its rehabilitation program], and not to produce "income".

*Id.* HRS § 237-23(b) thus frees the receipts in question from the levy of excise taxes.

But the Director of Taxation raises still another possible barrier, a procedural one, to the allowance of the claim of exemption. He apprises us of the taxpayer's failure to comply with the provisions of HRS § 237-23(b) (1) which make annual registration as an exempt organization a prerequisite for exempt status, and maintains the

---

earlier stages of rehabilitation. However, the gold tags are classified as employees, and receive a salary out of which they pay their own expenses directly, including the cost of their housing in one of Appellant's residence facilities, and Appellant is not entitled to the welfare benefits and food stamps for these residents. Most of the gold tags have poor employment records, and would thus have great difficulty in obtaining employment outside of Appellant's program. While living in these facilities, all residents continue to be bound by Appellant's strict rules and regulations regarding their activities, and continue to participate in Appellant's program of rehabilitation.

    c. The rental which each gold tag paid during the years in question was a flat sum which was established merely to help cover the cost to Appellant of operating these residence facilities. This same flat monthly rental is the amount allocated to the housing of those residents in the post re-entry and red tag stages of rehabilitation. No profit was made by Appellant in connection with these rentals . . . .

neglect is fatal.[7] We are of course mindful that statutory directives of this nature are generally regarded as mandatory. *Perry v. Planning Commission,* 62 Haw. 666, 678-79, 619 P.2d 95, 104 (1980); 2A C. Sands, *Sutherland on Statutory Construction* § 57.19, at 445 (4th ed. 1973).

The Stipulation of Facts upon which the taxpayer's appeal to the Tax Appeal Court was determined nevertheless states in part:

Appellant has also requested and received approval from the Department of Taxation of the State of Hawaii, of its exemption from the payment of general excise taxes under the provisions of Section 237-23, Hawaii Revised Statutes, as amended, for the period beginning January 1, 1971 and ending June 30, 1978. Copies of Appellant's Application for Exemption and of the letter from the Department of Taxation of the State of Hawaii dated September 7, 1977 confirming this exemption are attached hereto as Exhibits 5 and 6, respectively.

and

For purposes of this tax appeal, the statements made in this Stipulation of Facts may be accepted as fact, and the Exhibits referred to herein and attached hereto may be treated as authentic and true copies of the originals thereof.

We cannot ignore the "fact" that the taxpayer has "received approval from the Department of Taxation" of its exempt status "for the period beginning January 1, 1971 and ending June 30, 1978," which covers the fiscal years implicated in the appeal, notwithstanding the alleged neglect. The cited impediment, we must conclude, has been removed by agreement of the Department of Taxation.

### 3.

The taxpayer next posits a claim that interest payments received in 1975 and 1976 from the sale of real property under an agreement of sale are not subject to excise taxes. The proposition advanced here is that the transaction did not give rise to excise tax liability because Habilitat "is not and has not been engaged in 'business'."

---

[7] The parties have stipulated that the taxpayer's initial application for registration as an exempt organization was filed in 1977 and approved by the State Department of Taxation on September 7, 1977.

The tax scheme established by HRS Chapter 237, however, levies charges on economic activity, whether carried on by one engaged in "business" or by an organization with charitable aims. The legislature, as we have seen, has been most niggardly in meting out exemptions therefrom. And the interest payments received from the sale of real property are definitely not exempt, though the recipient may be an exempt organization within the meaning of HRS § 237-23(a) (6). For "gross income" as defined by HRS § 237-3 specifically covers interest, and the transaction had a purpose of producing income. While the section further provides that "gross income" does not include "gross receipts . . . from the sale of land in fee simple," we have previously ruled that interest payments do not fall within this exclusion. *Hawaiian Beaches, Inc. v. Kondo,* 52 Haw. 279, 282, 474 P.2d 538, 540 (1970).

4.

Habilitat's theses regarding the gross income from "other sources" — benefit concerts, speaking engagements, consultation services, vending machines, and the showing of a film — are essentially those expounded earlier. Since the performers at the benefit concerts contributed their services, it further claims the receipts derived therefrom were actually "gifts". It likewise views the gross income from the sale of donated items in a category discussed earlier as "gifts".

We experience no difficulty in concluding the activities here had a primary purpose of generating income for use in Habilitat's program, although the speaking engagements and the furnishing of consultant services also furthered educational objectives. We also find the contentions that the receipts from the benefit concerts and the sale of the donated items were non-taxable donations lack merit. As the tickets and the items in question were sold with economic gain as the object, what was received by Habilitat from the sales was taxable. Thus, all of the gross income from "other sources" was properly taxed.

III.

Having disposed of the excise tax issues we focus on the remaining question that warrants discussion, whether Habilitat's ordering

of items from out-of-state suppliers for direct delivery to persons in Hawaii were transactions subject to HRS Chapter 238, the Use Tax Law.

HRS § 238-2 imposes a levy "on the use in this State of tangible personal property which is imported, or purchased from an unlicensed seller, for use in this State." The tax buttresses the general excise tax as it is designed to prevent the avoidance of excise taxes through direct purchases from the mainland.[8] Its ultimate purpose is to remove the competitive advantage an out-of-state wholesaler or retailer would otherwise have over a seller subject to the payment of State excise taxes.

At issue are the transactions where residents of Habilitat solicited orders for "advertising specialty items" for direct delivery to others by mainland suppliers. The items in question "consist of various products which are embossed with the name[s] of the businesses to whom these products are sold." The Stipulation of Facts presented to the Tax Appeal Court contained the following resume of a typical transaction:

> A sales order is prepared by the salespersons [sic] at the time of the sale and transmitted to Appellant's office in Hawaii. A purchase order is then issued to the mainland suppliers (Arthur Salm of Minneapolis, Missouri and HIT Corporation of New York), who then transmit the goods ordered directly to the purchaser.

---

[8] A legislative committee report accompanying the measure enacting the use tax stated in relevant part:

> The existing compensating tax law imposes a tax on sales of tangible personal property intended for resale in Hawaii by an unlicensed seller, if such transactions have been consummated through the services of a local manufacturer's agent or some other intermediary. The purpose of this tax is to protect our local wholesalers who are assessed a tax of ½ of 1% on their sales by eliminating any unfair competitive advantage a non-licensed seller doing business in Hawaii may have if he escaped taxation. The Administration has pointed out, however, that a substantial volume of sales by unlicensed sellers to local buyers now escape taxation because such sales have been accomplished directly between buyer and seller without the services of an intermediary. Accordingly, it has recommended the repeal of both the consumption and compensating taxes and the enactment of a comprehensive use tax which will cover all transactions and situations presently taxable under the consumption and compensating taxes, as well as taxing the value of goods purchased directly from non-licensed sellers and brought into the State for resale.

Hse. Conf. Comm. Rep. No. 21, in 1965 House Journal 839, 843.

The taxpayer does not deny it caused the "advertising specialty items" to be imported. But it maintains this affords no basis for the assessment of use taxes because it neither possessed nor used the items. In its view, the ordering of the articles constituted "mere importation without 'use'." The statute, however, does not lend itself to the reading suggested by Habilitat.

We noted earlier that the enactment of the use tax in 1965 was prompted in part by the "substantial volume of sales by unlicensed sellers to local buyers [that] . . . escape[d] taxation because such sales . . . [were] accomplished directly between buyer and seller without the services of an intermediary." *See* note 8 *supra.* We may thus assume the relevant measure was intended to seal what was perceived as an escape hatch. Read in this light, the language of HRS Chapter 238 leaves no doubt that the import of the articles was subject to the use tax, notwithstanding that the transactions were structured to effect direct delivery of the purchased items.

HRS § 238-1 defines "use" as

any use, whether the use is of such nature as to cause the property to be appreciably consumed or not, or the keeping of the property for such use or for sale, and shall include the exercise of any right or power over tangible personal property incident to the ownership of that property.

The statutory term thus covers the exercise of any right or power incident to the ownership of personal property. Habilitat exercised such right or power over the "advertising specialty items" when it directed the unlicensed sellers to transmit the purchased goods to persons who had ordered them from its residents. The transactions were clearly within the reach of the use tax.

Although other issues are raised, we find that they do not warrant further discussion.

The decision of the Tax Appeal Court is affirmed in part and reversed in part, and the case is remanded for the entry of a judgment consistent with this opinion.

*Wesley H. Sakai, Jr. (Jay M. Fidell* with him on the briefs; *Edward R. Bendet* with them on reply brief; *Bendet, Fidell & Sakai,* of counsel) for taxpayer-appellant.

*T. Bruce Honda (Harriet Yoshida Lewis* on the brief), Deputy Attorneys General, for appellee, Department of Taxation.