82 P.3d 804

In the Matter of the TAX APPEAL
OF BAKER & TAYLOR, INC.,
Taxpayer–Appellant

v.

Kurt KAWAFUCHI,[1] Director of
Taxation, State of Hawai'i,
Appellee.

No. 23376.

Supreme Court of Hawai'i.

Jan. 14, 2004.

1. Pursuant to Hawai'i Rules of Appellate Procedure Rule 43(c)(1), Kurt Kawafuchi, the current Director of Taxation, has been substituted for Ray K. Kamikawa, the Director at the time this case was decided by the tax appeal court.

Ronald I. Heller (Torkildson, Katz, Fonseca, Jaffe, Moore & Hetherington), on the briefs, for taxpayer-appellant.

Christopher J. Muzzi, Deputy Attorney General, State of Hawai'i, on the briefs, for appellee.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

We hold that Appellant Baker & Taylor, Inc. (Baker) is subject to the general excise tax of 4% under Hawai'i Revised Statutes (HRS) § 237-13(2)[2] (1993) & (Supp.

2. For the tax years in question, 1994, 1995, 1996 and 1997, HRS § 237-13(2) was not altered in relevant part. Therefore, we refer to HRS § 237-13(2) (1993), which states in relevant part:

**Imposition of tax.** There is hereby levied and shall be assessed and collected annually *privilege taxes* against persons on account of their business and other activities in the State

1994)[3] on its sales made to the Hawai'i State Library (the Library), but not subject to a use tax of 0.5% under HRS § 238–2(2) (1993)[4] on such transactions. Baker appeals from the March 29, 2000 orders and judgment of the Tax Appeal Court (the court)[5] denying Baker's Motion for Summary Judgment and granting the Cross–Motion for Summary Judgment of Appellee State of Hawai'i Director of Taxation (Director) which had argued Baker was subject to both the general excise and use taxes. On appeal, Baker argues that it did not conduct operations in Hawai'i sufficient to be subjected to the general excise tax because 1) title to the property sold passed to the Library outside of Hawai'i and 2) imposition of the tax would violate the Commerce Clause of the United States Constitution.[6] Baker argues that it is not subject to Hawaii's use tax as well. We

affirm the court's grant of summary judgment insofar as it relates to general excise taxes but vacate the judgment insofar as it relates to use taxes, on the grounds set forth below, and remand the matter to the tax appeal court for entry of partial summary judgment in Baker's favor and against the Director on the issue of Baker's susceptibility to the use tax with respect to the sales in question.

## I.

### A.

Baker is a Delaware corporation and has its headquarters and principal place of business in Charlotte, North Carolina.[7] During the time period covered by the tax assessments, Baker had no office in Hawai'i, no employees based in Hawai'i, and no real

measured by the application of rates against values of products, gross proceeds of sales, or gross income, whichever is specified, as follows:

. . . .

(2) Tax on business of selling tangible personal property; producing.
(A) *Upon every person engaging or continuing in the business of selling any tangible personal property whatsoever ... there is likewise hereby levied, and shall be assessed and collected, a tax equivalent to four per cent of the gross proceeds of sales of business;* . . . .
(B) *Gross proceeds of sales of tangible property in interstate and foreign commerce shall constitute a part of the measure of the tax imposed* on persons in the business of selling tangible personal property, *to the extent, under the conditions, and in accordance with the provisions of the Constitution of the United States* and the Acts of the Congress of the United States which may be now in force or may be hereafter adopted, and whenever there occurs in the State an activity to which, under the Constitution and Acts of Congress, there may be attributed gross proceeds of sales, such gross proceeds shall be so attributed.
(C) No manufacturer or producer, engaged in such business in the State and selling the manufacturer's or producer's products for delivery outside the State (for example, consigned to a mainland purchaser via common carrier f.o.b. Honolulu), shall be required to pay the tax imposed in this chapter for the privilege of so selling the products, included only in determining the measure of the tax imposed upon the manufacturer or producer as such.
(Emphases added.)

3. In 1994, only section (1) relating to general excise tax imposition on manufacturers was amended. Section (2), applicable to Baker, was not amended.

4. The applicable statute for the tax years 1994, 1995, 1996, and 1997 is HRS § 238–2(2) (1993), which states in relevant part:

There is hereby levied an excise tax on the use in this State of tangible personal property which is imported, or purchased from an unlicensed seller, for use in this State. The tax imposed by this chapter shall accrue when the property is acquired by the importer or purchaser and becomes subject to the taxing jurisdiction of the State. The rates of the tax hereby imposed and the exemptions thereof are as follows:

. . . .

(2) If the importer ... is ...
(A) A retailer or other person importing or purchasing for purposes of resale, ... the tax shall be one half of one percent of the purchase price of the price of the property, if the purchase and sale are consummated in Hawaii[.]

5. The Honorable Gary W.B. Chang presided over this matter.

6. Article I, Section 8 of the United States Constitution prohibits the states from imposing taxes on interstate commerce by explaining that "Congress shall have power to lay and collect taxes ... [t]o regulate Commerce ... among the several States[.]"

7. The facts herein are essentially from the stipulation of facts filed by Baker and the Director on October 25, 1999.

property in Hawai'i. The firm was never registered with the Department of Commerce and Consumer Affairs of the State of Hawai'i. The firm did hold a Hawai'i General Excise Tax ID license at one time but it sent notice on February 1, 1996 to the Department of Taxation (Department) of its decision to cancel its registration. Baker used common carriers, such as the United Parcel Service, to deliver its goods to Hawai'i.

Prior to February 1, 1996, Baker made a series of sales to customers, including the Library, and included in its contracts a clause that made the sales FOB ("free on board") Hawai'i. The term FOB generally designates where title to goods passes from the seller to the buyer. *See Black's Law Dictionary* 642 (6th ed.1990). Thus, "FOB Hawai'i" meant that title to the goods passed from Baker to the customer when it reached Hawai'i.

On or about April 25, 1995, Baker sent a letter to the Department, inquiring whether it would be subject to the general excise tax if it used the FOB shipping point terms and, if not, whether the Department could require its competitor to pay the general excise tax. On April 15, 1995, the Department responded that Baker was subject to the general excise tax of 4% and a use tax of 0.5%.[8] On March 28, 1996, Baker contracted with the Library to furnish books and other educational materials (the Library Contract). For the March 28, 1996 contract, however, Baker altered the terms of the contract to FOB point of shipment. This meant that title passed from Baker to the customer at the loading docks on the mainland from which the goods would be shipped to Hawai'i. Baker made this change after it determined its competitor for the 1996 contract did not hold a general excise tax license and, consequently, reasoned that the competitor was absolved from

paying general excise taxes on sales made with an FOB point outside Hawai'i.[9]

The sales made under the Library Contract constituted roughly 70% of the transactions at issue in this case. The remaining 30% of sales involved other customers located in Hawai'i. Under the terms of the Library Contract, the Library had a right to inspect the ordered goods upon possession in Hawai'i and to reject any nonconforming goods. The company requested that the Library notify it of any books damaged by the carrier to enable Baker to arrange for the return of the rejected materials. Baker paid for the shipping costs of any defective or improperly shipped items.

Baker did have contacts with its customers in Hawai'i, including the Library, during the time period covered by the Tax Assessments (1994, 1995, 1996, 1997). It sent catalogs to its customers in Hawai'i, who used software supplied by Baker. It accepted orders by facsimile and via the Internet from its customers in Hawai'i, who used software supplied by Baker. It provided toll free 800 numbers "for customer service, placing orders, pricing, technical support, etc."

Baker sent employees to Hawai'i to meet customers and potential customers. The employees came for at least one day and stayed as long as one month. Since 1993, Baker's School Library sales representative had come to Hawai'i once per year and spent three to four days visiting existing customers and had attended a school trade show. From March 1993 until November 7, 1998, on at least eleven separate occasions, between one and four Baker employees had met with representatives of the State Libraries Material Processing Center (SLMPC) in Hawai'i. These meetings involved (a) training Department of Education (DOE) staff on how to use software from Baker, (b) updating and informing DOE employees of Baker's new and changing services, and (c) face-

---

8. The Department had always levied 4% general excise taxes on Baker based on HRS § 237–13(2)(A). Baker had paid this general excise tax but stopped payment of the tax for the fiscal years July 1, 1994 to June 30, 1997.

9. According to the Director,

there would have been no detriment to [Baker] if it included in its bid price amounts allocated for general excise tax because HRS § 103–53.5 equalizes the bids of those contractors not subject to general excise or use tax by adding the applicable retail rate of general excise tax and use tax to the bid price in of [sic] determining the lowest bid price.

to-face meetings with DOE employees regarding (i) business services provided by Baker, (ii) recurring problems with computer disk and barcode materials purchased from Baker, (iii) Baker's quality control, and (d) problems that arose from the goods and services purchased by the Library from Baker. Baker did not charge additional fees for any of these services.

On at least eleven separate occasions between July 31, 1995 and December 28, 1998, Baker employees (from one to six) met members of the Library or others in Hawaiʻi, with respect to the March 28, 1996 Library Contract. In January 1996, a Baker employee was in Hawaiʻi for approximately one month. The purposes of Baker's visits to Hawaiʻi included (a) preparation of a proposal for the Library contract, (b) visiting with libraries to meet library employees about the Library Contract and to discuss problems and concerns with the Contract, (c) meeting employees regarding the creation and updating of profiles of the individual libraries, and (d) consulting with the Board of Education's Blue Ribbon Panel regarding the contract.

### B.

The Department filed a notice of assessment dated September 18, 1998 to Baker for collection of the 4% general excises taxes due on transactions during the fiscal years ending on June 30, 1994, 1995, 1996, and 1997, as well as interest and penalties pursuant to HRS §§ 237–36[10] and 238–7[11] (1993). It also took the position that, based on HRS § 238–2, Baker was liable for use taxes of 0.5% on the transactions. Baker refused to pay taxes under HRS § 237–13, explaining that the State can only tax transactions made in Hawaiʻi. Arguing that title to the goods had passed to the Hawaiʻi customer on the mainland (by the new contract term of FOB point of shipment), Baker claimed it no longer engaged in taxable activities in Hawaiʻi.

On October 2, 1998, Baker paid $256,386.46 to the Department under protest. It later conceded that $27,010.70 of the assessment was correct. Based on this concession, the Department waived part of the penalties in the amount of $5,183.80. Baker also argues that it is not liable for the use tax assessment because under HRS §§ 238–2[12] and 238–1,[13] it did not "use in this State ... tangible personal property." Therefore, Baker contends that it did not have ownership of the property while that property was within the state.

According to Baker, a lawsuit, *Baker & Taylor v. State of Hawaiʻi*, Civil No. 97–4646–11, was filed on November 10, 1997 between the Library and Baker in the circuit court of the first circuit involving a claim of breach of contract. Faced with the issue of where delivery of the goods had occurred, the trial court in that case ruled that delivery

**10.** HRS § 237–36 (1993) outlines the procedures for tax assessments based on erroneous returns and disallowance of exemptions. It states in relevant part:

If any return made is erroneous, or is so deficient as not to disclose the full tax liability, or if the taxpayer, in the taxpayer's return, shall disclaim liability for the tax on any gross income or gross proceeds of sales liable to the tax, or if the taxpayer shall make application ... for an exemption to which the taxpayer is not entitled, the department of taxation shall correct the error or assess the proper amount of taxes. If such recomputation results in an additional tax liability, or if the department proposes to assess any gross income or gross proceeds of sales by reason of the disallowance of an exemption claimed in the return or for which application ·has been filed, the department shall first give notice to the taxpayer of the proposed assessment, and the taxpayer shall thereupon have an opportunity within thirty days to confer with the department.

**11.** HRS 238–7 (1993) allows for additional assessments and states in relevant part:

Sections 237–36 to 237–40 of the general excise tax law are hereby made applicable to the taxes imposed by this chapter ... to assessments ... for which purpose any references therein to "gross income" or "gross proceeds of sale" shall be deemed to refer to the purchase price or value, as the case may be, subject to tax under this chapter[.]

**12.** *See supra* note 4.

**13.** HRS § 238–1 (1993) states in relevant part:

"Use" ... means any use, whether the use is of such nature as to cause the property to be appreciably consumed or not, or the keeping of the property for such use or for sale, and shall include the exercise of any right or power over tangible personal property incident to the ownership of that property[.]

and passing of title had occurred on the mainland in accordance with the FOB point of shipment terms. The Department was not a party to the litigation, but the State of Hawai'i was a party. According to Baker the case was settled and dismissed by stipulation. The record does not indicate whether an appeal was filed in that case.

On October 6, 1998, Baker filed a notice of appeal to the court contesting the general excise taxes and use taxes assessed. In that regard, Baker filed a motion for summary judgment on October 25, 1999 with the court, and the Director filed its own motion for summary judgment on October 25, 1999. As mentioned before, the court granted the Director's motion and denied Baker's motion on March 29, 2000.

## II.

■ We review an award of summary judgment *de novo* under the same standards applied by the trial court. *Kamikawa v. Lynden Air Freight, Inc.*, 89 Hawai'i 51, 54, 968 P.2d 653, 656 (1998). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Hawai'i Rules of Civil Procedure Rule 56(c).

## III.

■ Baker contends that: (1) the term "sale" should be accorded the definition consistent with that found in the Uniform Commercial Code which defines a sale as the passing of title; (2) the place where title to

the goods passes should determine the state in which a "sale" occurs for purposes of HRS § 237–13(2)(A); and (3) because the sales did not take place in Hawai'i, it is not subject to the general excise tax. The Director, however, argues that the general excise tax applies to proceeds from sales made to customers located in Hawai'i irrespective of where title to the goods passed. Thus, according to the Director, the gross proceeds from these transactions should be subject to the general excise tax.[14]

## IV.

### A.

■ As previously indicated, HRS § 237–13 provides that "[t]here is hereby levied and shall be assessed and collected annually *privilege taxes against persons on account of their business and other activities in the State* measured by the application of rates against values of products, gross proceeds of sales, or gross income[.]" (Emphasis added.) HRS § 237–2 (1993) provides that the term "business" includes "*all activities* (personal, professional, or corporate), engaged in or caused to be *engaged in with the object of gain or economic benefit either direct or indirect*, but does not include casual sales." (Emphases added.) Furthermore, HRS § 237–13(2)(A) provides that "[u]pon every person engaging or continuing in the business of selling any tangible personal property whatsoever[,] ... *there is likewise hereby levied, and shall be assessed and collected, a tax equivalent to four per cent of the gross proceeds of sales of the business* [.]" (Emphasis added.) HRS § 237–1 (1993) indicates the term sale or sales "includes the exchange

---

**14.** The Director refers to Taxpayer Information Release (TIR) 95–5 and Hawai'i Administrative Rules (HAR) Rule 18–237–13–02.01 for the proposition that the "place of delivery" (i.e., the place where the goods are delivered determines the applicable tax laws) determines whether or not the Hawai'i general excise tax would apply on a sales transaction. For the purposes of this case, we recognize that neither of these sources would determine the outcome in this situation.

We note that with respect to TIR 95–5, TIRs are not authoritative statements of the law and thus are not determinative of the issue. Addressing the applicability of the aforesaid rule, we

recognize that under the Hawai'i Administrative Procedure Act, the Department is authorized to adopt a formal interpretation of the HRS, that cannot contradict the statutes. HAR 18–237–13–02.01 codifies TIR 95–5, which outlines the "place of delivery"-doctrine. Although this Rule would support the Department's position, HAR 18–237–13–02.01 became effective on May 26, 1998, after the last of the tax years at issue ending June 30, 1997. The HAR specifically states that the rules do not have retroactive effect, and therefore, this Rule is inapplicable in this case.

of properties as well as the sale thereof for money." As is evident from the language of HRS § 237–2, Hawaii's general excise tax is a gross receipts tax on the privilege of doing business in Hawai'i,[15] thus Hawaii's general excise tax is a privilege tax. *In re Grayco Land Escrow,* 57 Haw. 436, 447, 559 P.2d 264, 272 (1977) (holding that the general excise tax "is based on the privilege or activity of doing business within the State and not on the fact of domicile").

■■■ A privilege tax is assessed a party based on the fact that the party chose to engage in business activity within the state. *Id.* Such a tax is justified on the ground that companies conducting business enjoy the protections and benefits given by the state. *Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 444, 61 S.Ct. 246, 85 L.Ed. 267 (1940) (holding that a foreign corporation licensed to do business within the state may be subject to a privilege tax "if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society"); *see also In re Heftel Broadcasting,* 57 Haw. 175, 182–83, 554 P.2d 242, 248 (1976) (holding that licensors of films and television series "had extended [their] activities, with respect to the film prints and the telecast rights of those film prints, so as to avail itself of the protection, opportunities and benefits afforded by this State"). Hawaii's general excise tax is especially broad in scope because "in plain and unmistakable language the statute evidences the intention of the legislature to tax every form of business, subject to the taxing jurisdiction, not specifically exempted from its provisions." *Grayco Land,* 57 Haw. at 443, 559 P.2d at 270. The gross proceeds from sales of the business are a measurement of the amount of activity.[16] *See id.* at 449, 559 P.2d at 273 ("The tax in question is levied upon the privilege or activity of doing business within the state. . . . It is measured . . . by the income realized by the particular

activity engaged in by the taxpayer within the state.").

### B.

■■■ HRS § 237–13(2)(A) specifically taxes "every person engaging or continuing in the business of selling *any tangible personal property* . . . four percent of the gross proceeds of sale of the business." (Emphasis added.) Obviously, tangible personal property includes books and products of the sort sold by Baker. As previously stated, HRS § 237–2 defines business as *"all activities* . . . engaged in or caused to be engaged in with the object of gain or economic benefit either direct or indirect. . . ." (Emphasis added.) Plainly, Baker was engaged in selling books to the Library for economic gain. As recounted, *supra,* "activities" by Baker took place "in the state." "[O]n account" of its "business and other activities," Baker was subject to the tax of "four percent of the gross proceeds of sale of the business." HRS § 237–13(2)(A). Through its business activity in Hawai'i, Baker obtained opportunities, protections, and benefits afforded by the State. Accordingly, Baker came within the purview of HRS § 237–13(2).

### V.

Baker posits in its opening brief that under the express terms of HRS § 237–13, if a sale does not occur in Hawai'i, it is not subject to the tax. It argues that the "critical language states that the tax is assessed against a taxpayer with respect to the taxpayer's business and other activities **'in the State.'** Thus, with respect to the sale of goods, the tax applies to sales made **in the State.**" (Boldfaced font in original.) In order to support this premise, Baker contends that the term "sale" in HRS §§ 237–13(2) and 237–1 should be accorded the definition applied to the same term as employed in the Uniform Commercial Code, that is, "[a] sale consists in the passing of title from the seller to the buyer for a price." HRS § 490:2–106 (1993).

---

15. *See supra* note 2.

16. The United States Supreme Court has recognized that the general excise tax is an indirect tax on transactions. *Aloha Airlines v. Dir. of Taxation of Hawaii,* 464 U.S. at 14, 104 S.Ct. 291 (1983).

Arguing that title of the goods passed on the mainland by virtue of the FOB shipping point and that the circuit court had ruled in a breach of contract case between Baker and the Library that title to the books passed on the mainland,[17] Baker contends that no sale occurred in Hawai'i subject to the general excise tax. The term sale, however, is defined in HRS § 237–1 as "includ[ing] the exchange of properties as well as the sale thereof for money." Furthermore, HRS § 237–13(2)(A) does not, as Baker contends, "specif[y] a tax on the 'gross proceeds of sales.'" Rather, HRS § 237–13 indicates the tax is imposed "*on account* of [the taxpayer's] business and other activities in the state." (Emphasis added.) Such activity is "measured by the application of rates" as "specified" by the statute. HRS § 237–13.

In *Grayco Land*, KBSF Land Co., Inc. ("KBSF"), a California vendor, executed a contract in California for the sale of subdivided property located in Hawai'i with Grayco, as trustee, an out-of-state buyer. Interest income earned on the installment payments were deposited in a California bank. *Grayco Land*, 57 Haw. at 456–57, 559 P.2d at 277. KBSF had its principal place of business in Beverly Hills, California but later moved it to Boston, Massachusetts. *Id.* at 437, 559 P.2d at 267. However, KBSF was licensed to do business in Hawai'i and advertised the availability of the lots through newspaper ads, radio announcements, and television broadcasts in Hawai'i. *Id.* at 440, 559 P.2d at 268. KBSF also held legal title to the property in a trust capacity. *Id.*

It was noted that KBSF had derived income from its activities of "investing capital in the State of Hawaii" through the development and sale of land. *Id.* at 444, 559 P.2d at 270–71. This court pointed out that the tax applied to Grayco was measured "by the particular activity engaged in by the taxpay-

er within the state." *Id.* at 448, 559 P.2d at 273. The fact that the sales agreement was executed outside of Hawai'i and the installment payments, including the interest, were paid and deposited in California did not alter this court's decision. *Id.* at 445, 559 P.2d at 271. This court relied on the holding in *J.C. Penney.* In that case, the imposition of a Wisconsin gross receipts tax on a Delaware corporation for the privilege of carrying on a local business, hinged on whether "the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society." *Id.* at 448, 559 P.2d at 273 (quoting *J.C. Penney*, 311 U.S. at 444, 61 S.Ct. 246). This court concluded that KBSF had engaged in sufficient business activities in Hawai'i and been given "certain governmental benefits" to justify subjecting its interest income to Hawaii's general excise tax. *Id.* at 449, 559 P.2d at 273; *cf. Hawaiian Beaches, Inc. v. Kondo*, 52 Haw. 279, 282–83, 474 P.2d 538, 541 (1970) (holding that the general excise tax may be imposed on a Hawai'i corporation although agreement of sale and installment payments, including interest, were made and executed outside of Hawai'i because of the "investment of the capital of the business in Hawaii").

Although Baker did not have any office in Hawai'i, Baker was not a passive seller of goods to Hawai'i consumers. It engaged in active solicitation in Hawai'i by sending employee representatives to meet potential and current purchasers of its products. The sales at issue were made pursuant to a contract that Baker obtained through bidding with the State for the Library's business. Baker provided software and training for purchasing and cataloging its materials in Hawai'i. Its representatives visited Hawai'i on an ongoing basis to support its customers,

---

**17.** Baker invokes the doctrine of collateral estoppel to assert that title to the goods did indeed pass to the Library on the mainland. It argues that the Library was a party to the circuit court suit and the Library was the State of Hawaii's agent. Therefore, citing to 47 Am.Jur.2d *Judgments* § 699, at 165, it maintains that "[a] decision for or against one political subdivision or agency of a government binds other political subdivisions of the same government." Thus,

Baker contends that the State of Hawai'i is collaterally estopped from arguing that title did not pass on the mainland. We need not resolve the applicability of this doctrine because the determination of such an issue does not affect the outcome in this case. Moreover, the court in that case apparently made no findings of fact or conclusions of law and the case was settled and dismissed by stipulation.

as part of its effort to maintain its business in Hawai'i. It is evident that in engaging in such activity, Baker received the "benefits and protection of the laws of the state, including the right to resort to the courts for the enforcement of its rights." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *see also Black Constr. Corp. v. Agsalud*, 64 Haw. 274, 639 P.2d 1088 (1982) (applying the *Int'l Shoe* test to imposition of an unemployment insurance tax on out-of-state corporation). Applying the principles in *Grayco Land*, there was sufficient "business and other activities in the State" to impose the general excise tax on the Baker transaction. *See* HRS § 237–13 (Supp.2002). Because Baker is subject to the taxing jurisdiction of Hawai'i based on its activities within the state and there is no specific exemption applicable, Baker must pay the general excise tax assessed.

## VI.

■ The second issue is whether the imposition of the general excise tax, in this case, would violate the Commerce Clause. Baker has the burden of proof to demonstrate that application of the relevant statutes to it is unconstitutional. *Container Corp. v. Franchise Tax Bd.*, 463 U.S. 159, 164, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) (holding that taxpayer has burden of showing by "clear and cogent evidence" that the state tax contravenes the commerce clause); *Pray v. Judicial Selection Comm'n State of Hawai'i*, 75 Haw. 333, 340, 861 P.2d 723, 727 (1993) (stating that legislative enactments are presumptively constitutional and a party challenging a statutory scheme bears the burden of showing unconstitutionality beyond a reasonable doubt and the constitutional defect must be clear, manifest, and unmistakable). The Com-

merce Clause of the United States Constitution (art. 1, § 8, cl.3) generally prohibits states from levying taxes that impose multiple burdens on, or discriminate against, interstate commerce. *See generally Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). This court has followed the *Complete Auto* rule when evaluating commerce clause taxing issues. Thus, the four-part test from *Complete Auto* has been applied to determine whether a tax contravenes the commerce clause. *In re Bacchus Imports, Ltd.*, 65 Haw. 566, 656 P.2d 724 (1982), *rev'd on other grounds*, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984); *In re Aloha Airlines, Inc.*, 65 Haw. 1, 647 P.2d 263 (1982), *rev'd on other grounds*, 464 U.S. 7, 104 S.Ct. 291, 78 L.Ed.2d 10 (1983) *In re Otis Elevator Co.*, 58 Haw. 163, 566 P.2d 1091 (1977).

In *Complete Auto*, the Court held that a tax which is assessed on companies for the privilege of doing business in the state does not contravene the commerce clause when "[1] the tax is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State." 430 U.S. at 279, 97 S.Ct. 1076. Because Baker does not claim that there is discrimination against interstate commerce or that the taxes are unrelated to the services provided by the State of Hawai'i, only the first and second prongs of the *Complete Auto* test are at issue.[18]

## A.

■ The first prong of the *Complete Auto* test requires that "the tax [be] applie[d] to an activity with a substantial nexus with the taxing State."[19] *Id.* at 279, 97 S.Ct.

---

18. Although Baker does not explicitly state that there is no issue as to the last two factors of the *Complete Auto* test, Baker does not expressly address these factors in its argument.

19. We note that Baker has already stipulated that it had sufficient minimum contacts in Hawai'i to establish Due Process Clause nexus. A tax that is constitutional under the Due Process Clause, however, is not necessarily valid under the Commerce Clause. *Quill Corp. v. North Dakota Tax Comm'n*, 504 U.S. 298, 312, 112 S.Ct. 1904, 119

L.Ed.2d 91 (1992). "In contrast to the due process clause's nexus inquiry with respect to the sovereign's power to tax which centers on the fundamental fairness of the governmental activity upon an individual, the commerce clause and its nexus requirement focuses on the effects of state regulation on the national economy." Carol Schultz Vento, Annotation, *Sufficient Nexus for State to Require Foreign Entity to Collect State's Compensating, Sales, or Use Tax–Post–Complete Auto Transit Cases*, 71 A.L.R. 5th 671, 683, 1999 WL 729013 (1999).

1076. In 1987, the Court expanded on the definition of substantial nexus in *Tyler Pipe Indus., Inc. v. Washington Dept. of Revenue,* 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987). In *Tyler Pipe,* the United States Supreme Court considered a statute that imposed a manufacturing tax on out-of-state corporations but that exempted local manufacturers. Local manufacturers were exempted because they already had to pay a wholesale tax. The same rate was applicable to both taxes. The Court ultimately held that the manufacturing tax was unconstitutional because it discriminated against interstate commerce, the third prong of the *Complete Auto* test.

Still, *Tyler Pipe*'s analysis of the *Complete Auto* test's first prong is instructive. The *Tyler Pipe* court set out the rule as follows: "[T]he crucial factor governing nexus is whether the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability to *establish and maintain a market in this state for the sales.*" *Id.* at 250, 107 S.Ct. 2810 (emphasis added). The Court found that the out-of-state company did have a substantial nexus with the state because its independent contractor in the state constantly solicited business for the firm and serviced its customers. We note that the analysis emphasizes the involvement of the sales representative in the state and not the domicile of the sales representative. Consequently, the Court agreed with the Washington court's analysis that Tyler Pipe's sales representatives' activities within the state, such as (1) "calling on its customers and soliciting orders[,]" (2) having "long-established and valuable relationships with Tyler Pipe's customers[,]" and (3) "maintain[ing] and improv[ing] the name recognition, market share, goodwill, and individual customer relations of Tyler Pipe[,]" were "adequate[ ][to] support the State's jurisdiction to impose its wholesale tax on Tyler [Pipe]." *Id.* at 249–51, 107 S.Ct. 2810.

Similarly, Baker's representatives made frequent visits to Hawai'i to service the Library. For example, Baker's employees came to Hawai'i to meet customers and potential customers. Since 1993, Baker's representatives had come to Hawai'i once a year to visit existing customers, spending three or four days, and had attended a school trade show. Between March 1993 until November 7, 1998, on at least eleven separate occasions, between one and four Baker employees had met with representatives of the SLMPC in Hawai'i. These meetings included training, updating DOE staff on use of software, and discussions to improve service. Also, between July 31, 1995 until December 28, 1998, on at least eleven separate occasions, between one and six Baker employees had met with members of the Library to (1) prepare a proposal for and secure the Library Contract, (2) visit Libraries and meet Library employees to discuss problems and concerns with the Library Contract and to create and update profiles on individual libraries, and (3) meet with the Board of Education's Blue Ribbon Panel regarding the contract. Presumably, Baker's representatives engaged in the foregoing activities within the state to "improve [its] name recognition, market share, good will, and individual customer relations[,]" *id.* at 249, 107 S.Ct. 2810, the same factors which *Tyler Pipe* determined were adequate to subject Tyler Pipe to Washington's taxing jurisdiction. Therefore, Baker conducted sufficient activity within the state to subject it to Hawaii's taxing jurisdiction. Additionally, in *Arizona Dep't of Revenue v. Care Computer Sys. Inc.,* 197 Ariz. 414, 4 P.3d 469 (Ariz.Ct.App.2000), the Court of Appeals of Arizona also focused on the involvement of the sales representative in the state. The court held that an out-of-state corporation was subject to Arizona's privilege tax on the sales and leases it made to Arizona consumers. *Id.* at 471. In transactions involving sales, *title to the goods passed out-of-state.* The corporation did not own any property in Arizona, maintain any inventory there, have a business address in the state, or hire employees or independent contractors residing in Arizona. Rather, the corporation hired a solicitor domiciled in California. Applying the *Tyler Pipe* substantial nexus test, the Arizona court observed that the visits by the solicitor with Arizona customers were frequent, the corporation sent trainers to assist customers in using the computer hardware and software it sold, and these visits were intended to and did create customer

satisfaction and additional sales for the corporation. *Id.* at 472. The appellate court determined that Care Computer's liability for Arizona's retail transaction privilege tax was based on "whether the activities performed on Care's behalf in Arizona were 'significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales.'" *Id.* at 471 (quoting *Tyler Pipe,* 483 U.S. at 250, 107 S.Ct. 2810). It explained that "[t]he trips by Care's salesperson to Arizona were intended to, and did, result in additional sales of Care products[ ]" and that "[t]he trips by Care trainers to Arizona were in part intended to, and presumably did, increase the satisfaction level of Arizona customers and encourage other members of that nursing home chain to buy Care products." *Id.* at 472.

Moreover, the Arizona court stated that although the business leases "were few in number and duration, ... they could, and did, develop into outright sales." *Id.* It reasoned that "[a]lthough Care's Arizona activity was of relatively low volume, 'the volume of local activity is less significant than the nature of its function on the out-of-state taxpayer's behalf.'" *Id.* (quoting *Arizona Dep't of Revenue v. O'Connor, Cavanagh, Anderson, Killingsworth & Beshears, P.A.,* 192 Ariz. 200, 963 P.2d 279, 287 (Ariz.App. 1997)).

Similarly, Baker sent its representatives to Hawai'i to train and service its customers. The "volume" and "function" of Baker's representatives in Hawai'i exceeded that of Care representatives. Baker's representatives spent more time in Hawai'i servicing customers. As mentioned previously, Baker's representatives, as few as one and as many as four, had come to Hawai'i to service the Library on at least eleven separate occasions. Care Computer retained ownership of property in Arizona. Here, Baker retained ownership rights with respect to the licensed software. Also, while Care Computer salespersons would visit its customers in Arizona only once for initial training lasting from one to several days, Baker met with and trained DOE employees, updated and informed DOE employees of Baker's new and changing services, discussed business services provided by Baker, worked on recurring problems with computer disk and barcode materials purchased from Baker, and advised on quality control and problems that arose from the goods and services purchased by DOE from Baker. *See Care Computer,* 4 P.3d at 472. Furthermore, the purposes of Baker's contacts with Hawai'i were related to its business with the Library. *See supra.* Thus, Baker's actions were " 'significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales.'" *Id.* at 471 (quoting *Tyler Pipe,* 483 U.S. at 250, 107 S.Ct. 2810).

### B.

Baker is correct in distinguishing between a privilege tax on the seller and a sales tax on the buyer for the purpose of assessing the validity of the tax on Baker under the Commerce Clause. *Norton Co. v. Dep't of Revenue of Illinois,* 340 U.S. 534, 537, 71 S.Ct. 377, 95 L.Ed. 517 (1951) (holding that "a state imposing a sales ... tax can more easily meet this burden [ (local incident sufficient to bring the transaction within the taxing power of the state) ], because the impact of those taxes is on the local buyer ... [but] this tax [ (retailer's occupation tax) ] falls on the vendor"). Accordingly, cases involving privilege taxes on the seller rather than sales taxes on the buyer are relevant to this inquiry. *See McLeod v. J.E. Dilworth Co.,* 322 U.S. 327, 328, 64 S.Ct. 1023, 88 L.Ed. 1304 (1944).

Baker's reliance on *McLeod,* however, is misplaced. Baker relies on *McLeod* to substantiate its assertion that its activities lacked a substantial nexus to Hawai'i. In *McLeod* a Tennessee corporation sold goods in Tennessee for delivery by common carrier to customers in Arkansas. The corporation was not registered to do business in Arkansas nor did it have any sales office in the state. Title to the goods passed upon delivery to the common carriers in Tennessee, and the corporation did not make any collections in Arkansas. The company made sales through independent contractors domiciled in Tennessee who were responsible for soliciting sales in Arkansas.

The Supreme Court held that imposition of a gross receipts tax on the Tennessee corporation by Arkansas was unconstitutional because the Court construed the tax to be a sales tax, rather than a use tax. The Court reasoned that "[a] sales tax is a tax on the freedom of purchase[,]" while a "use tax is a tax on the enjoyment of that which was purchased." *Id.* at 330, 64 S.Ct. 1023. Thus, the Court stated that "a tax on an interstate sale like the one before us and unlike the tax on the enjoyment of the goods sold, involves an assumption of power by a State which the Commerce Clause was meant to end." *Id.*

We do not find *McLeod* to be determinative. First, the *McLeod* case was decided at a time when the Supreme Court had held that state taxes on interstate commerce were per se unconstitutional. *See General Trading Co. v. State Tax Comm'n of Iowa*, 322 U.S. 335, 338, 64 S.Ct. 1028, 88 L.Ed. 1309 (1944) (holding that "no State can tax the privilege of doing interstate business"); *see also Care Computer*, 4 P.3d at 471 (holding that a retail transaction privilege tax does not require a higher level of nexus with the taxing state than a use tax because courts no longer adhere to the rule that "state taxes on interstate commerce [are] *per se* unconstitutional"). Moreover, cases which have upheld *McLeod* for this proposition (*Freeman v. Hewit*, 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265 (1946) and *Spector Motor Serv., Inc. v. O'Connor*, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951)) have been expressly overruled by *Complete Auto*. *Complete Auto* upheld a privilege tax on gross receipts from interstate business. The United States Supreme Court has subsequently held that "interstate commerce must bear its fair share of the state tax burden." *Dep't of Revenue v. Ass'n of Washington Stevedoring Co.*, 435 U.S. 734, 750, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978); *see also Care Computer*, 4 P.3d at 471 (rejecting the rationale in *McLeod* that state taxes on interstate commerce are per se unconstitutional).

## C.

The current case is distinguishable from *McLeod*. In *McLeod,* the court was concerned with whether the Commerce Clause permitted Arkansas to impose a sales tax on "sales made by Tennessee vendors that are consummated in Tennessee for the delivery of goods in Arkansas." *McLeod*, 322 U.S. at 328, 64 S.Ct. 1023. The Court held that because the "sale—the transfer of ownership—was made in Tennessee[, f]or Arkansas to impose a tax on such transactions would be to project its powers beyond its boundaries and to tax an interstate transaction." *Id.* at 330, 64 S.Ct. 1023. The only physical presence involved in *McLeod* was solicitation by salespeople who were domiciled in another state. Baker's situation, on the other hand, did not involve mere solicitation and a sale that was final as the goods were transferred to a common carrier. Baker was involved with an ongoing, long-term contract with the Library that required sales representatives to frequently meet with the Library representatives to discuss the quality of book delivery and to provide training for the software that Baker allowed the Library to use to catalog books after the sales.

## D.

Baker, based on *World Book, Inc. v. Dep't of Treasury & State of Michigan*, 222 Mich. App. 203, 564 N.W.2d 82, 84 (1997), *rev'd on other grounds*, 459 Mich. 403, 590 N.W.2d 293 (1999), also asserts that the Hawai'i tax violates the Commerce Clause because only the state where title passes can impose a sales tax. *World Book*, however, is factually distinguishable. In *World Book* the Court of Appeals of Michigan held that "[w]here interstate transactions are involved, only the state in which the retail sale is consummated can charge a sales tax on the transaction." *Id.* at 83. The court held that under its General Sales Tax Act a sales tax may be imposed upon sellers if the retail sale took place in the state. *Id.* at 84. The court further explained that "where there is no explicit agreement, title passes when a seller completes delivery, which in this case would be in Illinois [ (out-of-state) ] where plaintiff delivers its encyclopedias to the common carrier." *Id. World Book* emphasized the passing of title as determinative of whether a sale took place within the state for purposes of a sales tax. However, the company's only physical

presence in Michigan was established by the hiring of independent contractors to solicit sales in the state.· Here, Baker's tax liability is not based on where title passed but rather, on its activities within Hawai'i.

The facts of this case are more analogous to *Westinghouse Elec. Corp. v. State of Tennessee*, 678 S.W.2d 19 (Tenn.1984). In *Westinghouse*, title to the goods passed to the Tennessee consumer out-of-state. However, the Tennessee court found that the company had marketing offices in Tennessee and that sales representatives frequently met with Tennessee consumers, handled their complaints, and worked on modifying the equipment. According to the Tennessee Supreme Court, "technical assistance was required by the contract and clearly played an essential role in the whole transaction." *Id.* at 26. Consequently, the Tennessee court held that a privilege tax did apply to an out-of-state manufacturer who, pursuant to four contracts with a Tennessee consumer, manufactured and sold equipment to that consumer.

Likewise, Baker had a physical presence that was significantly associated with Baker's ·establishment and maintenance of the Hawai'i market. As mentioned before, after winning the bid for the Library's contract, Baker sent a number of sales representatives to discuss business with the Library and other consumers. Similar to the holding in *Tyler Pipe*, Baker's sales representatives established long and valuable relationships with the Library and thereby maintained name recognition and goodwill with its customers. Not only was this involvement a requirement under a contract, but such activity significantly enabled Baker to maintain the Library's business in Hawai'i. Baker's presence in Hawai'i was a continuous process of sales and service creating substantial legal nexus.

## VII.

The second prong of the *Complete Auto* test requires fair apportionment of taxable income by allocation of the gross receipts attributable to transactions made in the different states. *Goldberg v. Sweet,* 488 U.S. 252, 261, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989) held that fair apportionment occurs

when a tax is "internally" and "externally consistent."

██ Internal consistency asks whether there would be multiple taxation on the same transaction if every state used the same tax system. *See id.* Analyzing the general excise tax for internal consistency, the use of the tax system in Baker's situation does not lead to multiple taxation. Hawai'i levies the general excise tax only on sales proceeds that originate from purchasers in Hawai'i regardless of whether the seller is an in-state or out-of-state company. *See Insinger Mach. Co. v. Philadelphia Tax Review Bd.*, 165 Pa.Cmwlth. 344, 645 A.2d 365, 368 (1994) (holding that a city could impose a business privilege tax on gross proceeds generated by all businesses, regardless of their domicile, within its city limits). If every state were to impose a general excise tax, the mainland states where Baker's goods originate would not be able to tax the transactions where goods are shipped to Hawai'i with the Hawai'i consumer having the power to accept or reject the goods. Although packaging, arrangements for delivery, and actual loading of the products can occur in these states, the general excise tax system requires that there be some measurable gross proceeds from sales to apply the tax. Thus, although these activities may be crucial to the delivery of goods to consumers, these actions do not involve any activity that creates taxable sales proceeds. The general excise tax is measured by the sales activities in Hawai'i, the Library being the consumer. The source of sale proceeds in this case is the Library, a consumer in Hawai'i. *See Heftel* 57 Haw. at 181,.554 P.2d at 246–47. Because the sales activities took place in Hawai'i, Hawai'i appears to be the only jurisdiction that can tax the transaction. Hence, there does not appear to be any danger of multiple taxation.

██ External consistency asks whether the state has taxed only the portion of interstate revenues that reasonably reflects the in-state component of the taxed activity. *Goldberg*, 488 U.S. at 262, 109 S.Ct. 582. Addressing external consistency, the general excise tax only taxes gross proceeds from the sale of goods made to people who are located

in Hawai'i. Therefore, Hawai'i is properly limiting its taxing powers to sales made to consumers in its jurisdiction and only this in-state component of the sales is reflected under the statute. Even if a company, whether in-state or out-of-state, were to engage in solicitation activity in Hawai'i, any proceeds from sales made to out-of-state consumers would not be taxable under the general excise tax system. As stated in *Heftel,* the analysis of the general excise tax system involves a determination that the source of income is located in Hawai'i. 57 Haw. at 181, 554 P.2d at 246–47. This court stated that "unlike a sale of goods that takes place on the mainland with the goods being transported here, the license arrangement continued into this State wherein it was a source of income to the licensor." *Id.* Also, any sales made to consumers where the destination of delivery is out-of-state is exempt from the general excise tax under HRS 237–13(2)(C).[20] Since the general excise tax system only places a tax on sales made to consumers located in Hawai'i and requires some business activity in the state to generate these sales, it properly taxes only the in-state component of transactions for external consistency.

## VIII.

■ The final issue is whether Baker is subject to Hawaii's use tax. As previously indicated, the use tax statute, HRS § 238–2, states that "[t]here is hereby levied an excise tax on the use in this State of tangible personal property which is *imported,* or *purchased* from an unlicensed seller, for use in this State." (Emphases added.) The term "use" under HRS § 238–1 includes "any use, whether the use is of such nature as to cause the property to be appreciably consumed or not, or the keeping of the property for such use or for sale, and shall include the exercise

of any right or power over tangible personal property incident to the ownership of that property[.]"

Baker argues that inasmuch as it was stipulated that title passed on the mainland, Baker did not own the goods when they arrived in Hawai'i. Accordingly, Baker argues it is not subject to the use tax. On the other hand, the Department imposed the use tax on Baker on the bases that (a) Baker imported tangible personal property into Hawai'i for resale pursuant to HRS § 238–2(2) and (b) Baker "used" personal property as defined in HRS § 238–1 when it directed delivery of the purchased goods to Hawai'i customers.

■ "Where the language of a statute is plain and unambiguous, our only duty is to give effect to the statute's plain and obvious meaning." *Iddings v. Mee–Lee,* 82 Hawai'i 1, 7, 919 P.2d 263, 269 (1996). According to HRS § 238–1, "imported"[21] "includes importation into the State from any other part of the United States or its possessions or from any foreign country, whether in interstate or foreign commerce, or both." "Purchase" is defined as "any transfer, exchange, or barter, conditional or otherwise, in any manner or by any means, wheresoever consummated, of tangible personal property for a consideration." HRS § 238–1. The sale of books was directly from Baker to the Library. Therefore Baker did not import the books from an unlicensed seller. Furthermore, Baker did not purchase the books and "re-sell" the goods to the Library. Under the circumstances of this case Baker could not import from itself or purchase from itself. Therefore, Baker is not subject to the use tax under the plain language of HRS § 238–1.

Although the Director is concerned with the imposition of a uniform tax burden, the taxing burden is not at issue here. As HRS § 238–2 deals with the imposition of a tax on

20. HRS 237–13(2)(C) provides, in pertinent part: No manufacturer or producer, engaged in such businesses in the State and selling the manufacturer's or producer's products for delivery outside of the State (for example, consigned to a mainland purchaser via common carrier f.o.b. Honolulu), shall be required to pay the tax [(general excise tax)] imposed in this chapter[.]

21. Although the statute defines the word "import," there is a parenthetical qualifier directly after "import" which states, "(or any nounal, verbal, adverbial, adjective, or other equivalent of the term)". Therefore, the definition for "import" would be equivalent to "imported."

the "use in this State of tangible personal property[,]" it is inapplicable. The Director's reliance on *In Re Tax Appeal of Habilitat,* 65 Haw. 199, 649 P.2d 1126 (1982), is inapposite. Habilitat, a not-for-profit organization in Hawai'i, advertised the availability of mainland products to Hawai'i consumers. Consumers placed orders with Habilitat and Habilitat would have the mainland supplier ship the products directly to the Hawai'i consumer. The organization argued that it never possessed or used the property so it should not be assessed use taxes. This court disagreed, stating that the definition of use in HRS § 238–1 included "the exercise of any right or power over tangible personal property incident to the ownership of that property." *Id.* at 210, 649 P.2d at 1134. Since the organization had the power to order the mainland supplier to ship the goods to the consumer, the court found sufficient "right or power over the tangible personal property" to impose the use tax. *Id.* In contrast, Baker did not direct a third party supplier to ship the books to the Library. Rather, Baker itself was the supplier.

## IX.

For the foregoing reasons, we affirm the tax appeal court's March 29, 2000 orders and judgment with regard to the imposition of the general excise tax, but vacate with regard to imposition of the use tax and remand for proceedings consistent with this opinion.